**ALLEGHENY AIRLINES, Inc., et al.,**
Plaintiffs,

**Civil Aeronautics Board and Administrator of Civil Aeronautics,**
Intervenors,

v.

**VILLAGE OF CEDARHURST et al.,**
Defendants.

Civ. A. No. 12680/1952.

United States District Court
E. D. New York.

June 27, 1955.

872

Fowler Hamilton, New York City, Watt H. Denison, Jr., Andre W. G. Newburg, New York City, of counsel, for plaintiffs Allegheny Airlines, Inc., et al.

Sidney Goldstein, New York City, Nathaniel Fensterstock, New York City, of counsel, for plaintiff Port of New York Authority.

Samuel J. Cohen, New York City, Henry Weiss, New York City, of counsel, for plaintiffs Air Line Pilots Ass'n International et al.

Leonard P. Moore, U. S. Atty. for Eastern District of New York, Brooklyn, N. Y., Robert P. Doyle, General Counsel, Civil Aeronautics Administration, Washington, D. C., S. W. Bobskill, Regional Atty., New York City, Emory T. Nunneley, Jr., General Counsel, Civil Aeronautics Board, Washington, D. C., Gerald F. White, Chief, Litigation Division, Civil Aeronautics Administration, Raleigh, N. C., H. Grady Gatlin, Jr., Attorney, Civil Aeronautics Administration, Washington, D. C., Arthur D. Hickerson, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for intervenors.

James L. Highsaw, Jr., Gerald F. Krassa, Washington, D. C., of counsel.

James G. Moore, Garden City, N. Y., for defendant Village of Cedarhurst.

Emerson A. Swartz, Garden City, N. Y., for individual defendants.

Max M. Lome, Laurelton, N. Y., for Laurelton Civic Ass'n, Central Queens Allied Civic Council, Inc., Queens Committee for Aviation Reforms, Inc., amici curiae.

Jacob Javits, Atty. Gen. of State of New York, for petitioners.

William Alpert, Asst. Atty. Gen., amicus curiae.

Madeline C. Dinu, Detroit, Mich., for National Ass'n of State Aviation Officials, amicus curiae.

Leander I. Shelley, New York City, for Airport Operators Council, amicus curiae.

John T. Clancy, Long Island City, N. Y., for Chamber of Commerce of Borough of Queens, amicus curiae.

BRUCHHAUSEN, District Judge.

The action involves the constitutionality of an ordinance, prohibiting air flights over the Village of Cedarhurst, below 1,000 feet. It does not affect the rights of property owners.

The action was tried without a jury, following an order striking out the defendants' demand for a jury trial. D.C., 15 F.R.D. 490.

The plaintiffs, comprising ten Airline Companies, The Port of New York Authority, The Air Line Pilots Association International and nine air pilots in their individual capacities, having interests in and concerning New York International Airport, known as "Idlewild", situated in Queens County, State of New York, instituted this action against the Village of Cedarhurst and various named defendants in their official and individual capacities for a decree, adjudging unconstitutional and void and enjoining enforcement of an ordinance adopted by the said Village which prohibited the operation of aircraft below an altitude of 1,000 feet above the Village. The Village is situated within a mile of the Airport.

The Administrator of Civil Aeronautics and the Civil Aeronautics Board intervened as plaintiffs in the action.

Since the commencement of the action, the original plaintiff, All American Airways, Inc., changed its name to Allegheny Airlines, Inc.

Prior to the trial, a preliminary injunction order in favor of the plaintiffs was granted by this Court and affirmed on appeal, 106 F.Supp. 521; Id., 2 Cir., 201 F.2d 273, and a motion to dismiss a counterclaim contained in the answer of the individual defendants was denied, D.C., 111 F.Supp. 677. During the trial, counterclaims of the individual defendants, who were owners of dwellings situated within the village boundaries, and demands for judgment declaring the Airport to be a nuisance and for an injunction restraining the commission of trespass, were withdrawn. All of the defendants, in their pleadings, sought a dismissal of the complaint and, in addition thereto, the individual defendants questioned the validity of Federal regulations and statutes, authorizing the flight of aircraft at less than 1,000 feet above the Village and sought a decree,

declaring them unconstitutional and void.

The specific issue presented.

The basic question presented was whether Congress pre-empted the field of regulation and control of the flight of aircraft, including the fixation of minimum safe altitudes for take-offs from and landings at airports, despite the fact that such altitudes might be less than 1,000 feet. More particularly, the question is what, if any, airspace below the altitude of 1,000 feet Congress has determined to be navigable airspace, subject to flight control.

The origin and development of public airports, including Idlewild Airport, and related matters.

It is common knowledge that the use of airplanes in World War I for military purposes gave impetus to the development of planes for commercial use.

While Congress, more than 30 years prior to that event, had legislated in the branch of transportation pertaining to railroads and created the Interstate Commerce Commission to carry on that function, the first legislation recognizing the airplane as an instrument of transportation in commerce was the Air Commerce Act of 1926, following a message from President Coolidge to Congress stating that "aviation is of great importance both for national defense and commercial development." By that Act, 49 U.S.C.A. § 171 et seq., the Secretary of Commerce was empowered to provide for registration of aircraft; for the rating of aircraft as to worthiness; for the periodic examination and rating of air pilots; for the examination and rating of air navigation facilities available for the use of aircraft; for the establishment of air traffic rules and for the suspension and revocation of any of the certificates issued by the Secretary.

An early public expression of opinion that municipalities should build airports for the new traffic was the statement made in 1928 by Chief Judge Cardozo in the case of Hesse v. Rath, 249 N.Y. 436, 164 N.E. 342, viz.:

"Aviation is to-day an established method of transportation. The future, even the near future will make it still more general. The city that is without the foresight to build the ports for the new traffic may soon be left behind in the race of competition. Chalcedon was called the city of the blind, because its founders rejected the nobler site of Byzantium lying at their feet. The need for vision of the future in the governance of cities has not lessened with the years. The dweller within the gates, even more than the stranger from afar, will pay the price of blindness."

Rapid development of aviation resulted in the more comprehensive statute, the Civil Aeronautics Act of 1938, 49 U.S. C.A. § 401 et seq. By it was created a new Civil Aeronautics Board and a separate administrator and the Secretary of Commerce was relieved of jurisdiction. Congress thereby stressed the need for the development of aviation and the promotion of safety of operation and imposed upon the administrator consideration of "the encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense".

Congress, increasingly aware of the need of control of the means of transportation in interstate commerce, in 1940, 49 U.S.C.A. § 301 et seq., enlarged the jurisdiction of the Interstate Commerce Commission by charging it with the function of regulating the activities of motor carriers, thus largely replacing the control exercised over those means of transportation by States and Municipalities.

That Congress contemplated and enacted legislation for the comprehensive regulation of air commerce and that the

objectives have been carried out was indicated in the concurring opinion of Mr. Justice Jackson in the case of Northwest Air Lines v. State of Minnesota, 1944, 322 U.S. 292, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283, wherein he said:

"Congress has recognized the national responsibility for regulating air commerce. Federal control is intensive and exclusive. Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands. The moment a ship taxis onto a runway it is caught up in an elaborate and detailed system of controls. It takes off only by instruction from the control tower, it travels on prescribed beams, it may be diverted from its intended landing, and it obeys signals and orders. Its privileges, rights, and protection, so far as transit is concerned, it owes to the Federal Government alone and not to any state government."

Idlewild Airport originated in the year 1941, when the site was selected. The airport comprises approximately 4,900 acres of land, acquired by the City of New York from private owners, and, in part, by conveyances by the Town of Hempstead, wherein the defendant Village of Cedarhurst is situated, and by the State of New York. It was necessary to procure acts of the Legislature of that State, authorizing those conveyances. By Chapter 369 of the Laws of 1942 of that State, the Town of Hempstead was authorized to convey, gratis, to the City of New York 65 acres of land under water in Jamaica Bay, as laid out on the plan for the construction of Idlewild Airport, to be held by the grantee so long as the property should be used as an airport and related purposes and upon termination of such use to revert to the Town. The Town of Hempstead, pursuant to that statute, by deed dated May 4, 1942, conveyed the said land for that purpose and under the said condi-

tion. As part of the program, the boundary lines between the City of New York, County of Nassau and the Town of Hempstead were fixed by Chapter 895 of the Laws of 1945 of the State. The grant by the State of New York to the City of New York was perfected by Chapter 866 of the Laws of 1946, whereby lands under water in Jamaica Bay, formerly in Nassau County, "required by the city of New York for the municipal airport of Idlewild, Queens county," were conveyed.

Congress, during the same year, further pursued the announced plan of encouraging and aiding in the development of public airports by the enactment of a Statute entitled, "Federal Aid for Public Airport Development", 49 U.S.C.A. § 1101 et seq., and made large appropriations "to provide a system of public airports adequate to anticipate and meet the needs of civil aeronautics."

The State of New York actively participated in approving Idlewild as a public airport and in enabling its agency, The Port of New York Authority, to lease the airport from the City of New York and further develop it. The Authority was created in 1921, McK.Unconsol.Laws, § 6401 et seq., by a compact between the States of New York and New Jersey, with the consent of Congress Resolution Aug. 23, 1921, 42 Stat. 174. It was empowered to develop and operate terminal and transportation facilities in metropolitan New York and New Jersey and to promote and protect commerce in the area. Pursuant to Chapter 802 of the Laws of New York of the year 1947, McK.Unconsol.Laws, § 6601 et seq., and a similar statute, enacted by the State of New Jersey, N.J.S.A. 32:1–35.1 et seq., the Authority during that year entered into a lease of Idlewild for a long term of years from the City of New York. The said New York statute also authorized the Authority to apply for federal loans or grants in aid of air terminals. The policy of the State with respect to airports was set forth in the statute, viz.:

"* * * that the problem of furnishing proper and adequate air terminal facilities within the district is a regional and interstate problem, and that it is and shall be the policy of the two states (New York and New Jersey) to encourage the integration of such air terminals * * *.

"The effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance and operation of air terminals by the Port Authority is and will be in all respects for the benefit of the people of the states of New York and New Jersey, for the increase of their commerce and prosperity * * * and the Port Authority shall be regarded as performing an essential governmental function in undertaking the effectuation, establishment, acquisition, construction, rehabilitation, improvement, maintenance or operation thereof, and in carrying out the provisions of law relating thereto." McK.Unconsol.Laws, §§ 6601, 6604.

Pursuant to The Federal Airport Act, supra, the Federal Government agreed to advance approximately $4,000,000 for improvements to Idlewild Airport.

Idlewild Airport was opened on July 1, 1948. It is one of the largest and safest public airports in the world. It has ten miles of runways, each with a length of from one to two miles. More than one million overseas passengers annually use the airport, comparable to the number of passengers traveling by ship through the Port of New York. In the year 1953, the numbers of passengers and the freight passing through the airport were as follows: 2,402,094 passengers, 88,276,700 pounds of freight and 20,413,200 pounds of air mail. Eleven domestic and thirteen foreign airlines are engaged in the service.

Under the Civil Aeronautics Act of 1938 it devolved upon the Board "to promote safety of flight in air commerce by prescribing and revising from time to time" minimum standards for construction of aircraft, and aircraft appliances, reasonable rules and minimum standards for the inspection, servicing and overhauling of aircraft, rules governing the reserve supply of aircraft, parts and fuel and the maximum hours of airmen and other employees, air traffic rules and such other rules and standards as might be found necessary to promote safety in air commerce. Section 601 of the Statute empowered the Board to prescribe:

"Air traffic rules governing the flight of, and for the navigation, protection, and identification of, aircraft, including rules as to safe altitudes of flight and rules for the prevention of collisions between aircraft, and between aircraft and land or water vehicles."

The Board and the Administrator, pursuant to the Statute, adopted air traffic rules, controlling operation of aircraft throughout the United States, including the establishment of civil airways, likened to a system of highways for surface traffic (14 C.F.R.). Each airway is a path having a width of ten miles, between two airports, extending from an altitude of 700 feet above the surface of the land to infinity and is identified to the pilot by radio navigation aids. There are control areas around large cities for the regulation of air traffic entering, leaving or passing through the area, also control zones around each airport for even more detailed supervision of the flight of aircraft, leaving or passing through the zones.

The Village of Cedarhurst lies directly under at least one of the civil airways. It is embraced within the control area, designated as extending in a radius of approximately 40 miles from the Empire State Building and lies within the control zone of the Idlewild Airport, designated by the Administrator to embrace an area within a five mile radius of Idlewild. Air traffic along the aforementioned civil airways is controlled by some 28 air traffic control centers, whose jurisdiction extends outward from the Metropolitan

centers. These centers regulate traffic on the airways system into and out of control areas, handing it over to or taking it from the airport towers at a point which varies with conditions, but which extends somewhat outside of the control zone. The New York center is located at LaGuardia Field and its continental jurisdiction is bounded by a line extending from Hartford on the north to Binghampton, New York, on the northwest to Elmira, New York, and Brookville, Pennsylvania, west of Harrisburg, to a point midway between Baltimore and Philadelphia, and then to Salisbury, Maryland. It also exercises oceanic air traffic control over international flights.

The record shows in detail the manner wherein, in the interest of safety, this comprehensive control is set up, for the regulation of traffic operating in accordance with Instrument Flight Regulations, termed IFR, into and out of New York City. There is coordination between the New York Center and contiguous centers. Aircraft operating in the New York area is controlled by the New York Center until it is turned over to the Idlewild Airport control at a point where the plane has ceased to be a factor in the New York Center's other traffic, usually in the vicinity of the Scotland Beacon.

Once the aircraft has been turned over by the New York Center to the Idlewild tower it is then subjected to even more detailed directions which govern it until it reaches its final destination on the runway of the airport. There are three separate phases in the normal control of an aircraft landing at Idlewild under IFR conditions, each under the direction of a separate controller. First, there is the basic approach under the direction of the approach controller, operating from the instrument flight room in the tower. The latter is assisted by a controller in the liaison position, whose duty is to exchange information with other airports and facilities, and by radar observance of incoming flights. Operators of aircraft, approaching the Scotland Beacon at an altitude assigned to such aircraft by the New York Air Traffic Center, contact the Idlewild Approach Center. The aircraft then circle Scotland Beacon at the assigned altitude in a holding pattern. In this pattern aircraft are kept vertically separated at 1,000 feet intervals. Secondly, the approach controller directs the lowest aircraft in the Scotland holding pattern onto the instrument glide path of the Instrument Landing System which provides a precise means of navigation from the southwest onto Runway No. 4 at Idlewild Airport. He maintains a separation of three miles between aircraft on approach to the airport and can have up to three aircraft on final approach at the same time. Separation is achieved by observation on a radarscope. When the aircraft has left Scotland Beacon on its final approach, the approach controller normally instructs the pilot to contact the local tower controller who has the responsibility for the second phase of the operation, pertaining to actual landing clearance of the aircraft. As the aircraft touches down at the airport it comes under the supervision of the ground controller for the third and final phase of the landing, including the direction of the plane along the airport's taxi areas to the proper "terminal gate". There are 178 airports in this country at which operations are directed by the Civil Aeronautics Authority in accordance with uniform rules.

The Administrator has established instrument approach rules to be followed by aircraft landing at Idlewild. Such rules are mandatory when certain conditions prevail. Procedures require that aircraft approach Idlewild from the Scotland Beacon to the southwest in line with the end of Runway No. 4. If a ceiling of between 200 and 500 feet prevails with a visibility of not less than one-half mile, the aircraft will land on that runway, wind direction and strength permitting, and not pass over Cedarhurst. When the ceiling is between 500 and 1,000 feet, with not less than one and a half miles of visibility, and wind conditions prevent a landing on said run-

way, aircraft come in on the instrument glide path, break through the ceiling to the southwest of the end of said runway, circling to the east and north to land on the runway designated by the control tower. The uncontradicted testimony is that, when circling to land under such conditions, it is necessary that some aircraft, operating in accordance with the rules and under normal and safe procedures and tower directions, fly over Cedarhurst at altitudes of less than 1,000 feet.

The procedure for aircraft approaching for an instrument landing on Runway No. 4, missing their landing, requiring them to pull up for another approach, requires that the aircraft climb straight ahead to 500 feet, execute a right turn to a heading of 130°, climb out to the southwest leg of the Mitchell range and from thence to the Long Beach intersection. Such aircraft are then brought back to the Scotland Beacon for another approach to Runway No. 4. The uncontradicted testimony showed that under those circumstances, some aircraft necessarily pass over Cedarhurst at less than 1,000 feet. Whether they do so depends upon the precise point at which the pilot "declares his missed approach" being the point, along the instrument path leading to Runway No. 4, at which the pilot determines it is unsafe for continuance of the landing.

The airspace apart from the immediate reaches above the land is part of the public domain.

■ While property owners in Cedarhurst are not now parties to this action, and their claims for nuisance and trespass have been withdrawn, it is appropriate to consider their positions in that the defendants base some of their contentions upon the theory that the landowners possess the title to the airspace above their property up to the sky or to infinity. The theory is founded upon the ancient doctrine, termed "Cujus est solum ejus est usque ad coelum", meaning that he who owns the land owns the airspace above it. The origin of the doctrine and its application are mentioned in the cases of Swetland v. Curtiss Airports Corporation, D.C., 41 F.2d 929 and Hinman v. Pacific Air Transport, 9 Cir., 84 F.2d 755. None of the decisions, including the case of Butler v. Frontier Telephone Co., 186 N.Y. 486, 79 N.E. 716, 11 L.R.A.,N.S., 920, cited by the defendants, involved airspace at an altitude of more than 100 feet or airspace which would be normally used by an aviator. Whether the doctrine ever was the law in this jurisdiction need not be considered. There is no doubt that it is not now the law. In the case of United States v. Causby, 328 U.S. 256, 260, 66 S.Ct. 1062, 1065, 90 L.Ed. 1206, the Court said:

"It is ancient doctrine that at common law ownership of the land extended to the periphery of the universe. * * * But that doctrine has no place in the modern world."

In several recent cases our highest Court has reiterated that principle. Mr. Justice Jackson in a concurring opinion in the case of Northwest Airlines v. State of Minnesota, 322 U.S. 292, 302, 303, 64 S.Ct. 950, 956, 88 L.Ed. 1283, said:

"Aviation has added a new dimension to travel and to our ideas. The ancient idea that landlordism and sovereignty extend from the center of the world to the periphery of the universe has been modified. Today the landowner no more possesses a vertical control of all the air above him than a shore owner possesses horizontal control of all the sea before him. The air is too precious as an open highway to permit it to be 'owned' to the exclusion or embarrassment of air navigation by surface landlords who could put it to little real use. * * * Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water. Local exactions and bar-

riers to free transit in the air would neutralize its indifference to space and its conquest of time."

In the case of Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 107, 68 S.Ct. 431, 434, 92 L.Ed. 568, the Court said:

"Ancient doctrines of private ownership of the air as appurtenant to land titles had to be revised to make aviation practically serviceable to our society."

In the case of United States v. Causby, as appears from the opinion, in the lower Court, reported in 60 F.Supp. 751, 104 Ct.Cl. 342, a landowner sued the United States, the operator of an airport near his property, for damages. It appeared that planes taking off or landing at the airport, flew over his property at an altitude of 83 feet, clearing his house and barn, by less than 65 feet, so close in fact as to blow leaves off the tallest tree on the property. The Supreme Court, on the appeal in that case, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206, held that all airspace is in the public domain other than the airspace in the immediate reaches above the land. The language of the opinion, 328 U.S. at page 266, 66 S.Ct. at page 1068, so holding, is:

"The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land."

In the Hinman case, supra, 84 F.2d at page 758, the Court said:

"We own so much of the space above the ground as we can occupy or make use of, in connection with the enjoyment of our land. This right is not fixed. It varies with our varying needs and is coextensive with them. The owner of land owns as much of the space above him as he uses, but only so long as he uses it. All that lies beyond belongs to the world.

"When it is said that man owns, or may own, to the heavens, that merely means that no one can acquire a right to the space above him that will limit him in whatever use he can make of it as a part of his enjoyment of the land. To this extent his title to the air is paramount. No other person can acquire any title or exclusive right to any space above him.

"Any use of such air or space by others which is injurious to his land, or which constitutes an actual interference with his possession or his beneficial use thereof, would be a trespass for which he would have remedy. But any claim of the landowner beyond this cannot find a precedent in law, nor support in reason."

In the case at bar the evidence established that most of the flights above the Village of Cedarhurst were at altitudes exceeding 1,000 feet, that occasionally, under unusual conditions, a plane might fly over the Village at an altitude of 450 or 500 feet, but not lower than 450 feet. No claim is now made by the defendants that those flights interfered with the enjoyment of the land beneath.

Congress has the power to regulate commerce, including traffic by air.

The authority of Congress to legislate in matters of commerce proceeding over State boundaries was conferred by Article I, Section 8, Clause 3 of the Constitution, which, insofar as applicable, reads as follows:

"The Congress shall have Power * * * to regulate Commerce with foreign Nations, and among the several States * * *."

The earliest reference to that power was in connection with the navigation by water. Mr. Justice Marshall, writing

for the United States Supreme Court in the case of Gibbons v. Ogden, 1824, 9 Wheat. 1, 6 L.Ed. 23, said:

"All America understands, and has uniformly understood, the word 'commerce' to comprehend navigation."

Later and more recent cases in that Court hold that the said power of Congressional regulation includes all means and instrumentalities by which commerce is carried on, including traffic by air. Monongahela Navigation Co. v. United States, 1892, 148 U.S. 312, 342, 13 S.Ct. 622, 37 L.Ed. 463; Braniff Airways v. Nebraska State Board, 1953, 347 U.S. 590, 597, 74 S.Ct. 757, 98 L.Ed. 415.

Where Congress, pursuant to the Commerce Power, has regulated it to such an extent as to constitute preemption, the conflicting local legislation is precluded.

■ While the exercise of the Congressional power to regulate commerce does not prevent the States from exercising their inherent powers outside of the fields preempted by Congress, such as is illustrated by the cases of Northwest Airlines v. Minnesota, supra, and Braniff Airways v. Nebraska Board, supra, it does preclude the States from regulating those phases of national commerce "which, because of the need of national uniformity, demand that their regulation, if any, be prescribed by a single authority." Southern Pacific Co. v. State of Arizona ex rel. Sullivan, 1945, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915.

In the Braniff case, supra, it was also held that the Federal Acts regulating air traffic were based upon the commerce power and not on national ownership of the navigable airspace, as distinguished from sovereignty. The Court in the same case approved of the following statement contained in a Congressional report, viz. [347 U.S. 590, 74 S.Ct. 761]:

"The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil."

In this connection, it is appropriate to consider the respective rights of the Federal and local government, where their interests conflict.

The recent cases of California v. Zook, 1949, 336 U.S. 725, 69 S.Ct. 841, 93 L.Ed. 1005, and Castle v. Hayes Freight Lines, 1954, 348 U.S. 61, 75 S.Ct. 191, involved the construction of the Federal Motor Carrier Act and State statutes on the same subject.

In the Zook case, the Court said, 336 U.S. at page 728, 69 S.Ct. at page 843:

"Absent congressional action, the familiar test (as to state or national power over interstate commerce) is that of uniformity versus locality; if a case falls within an area in commerce thought to demand a uniform national rule, State action is struck down. If the activity is one of predominantly local interest, State action is sustained. More accurately, the question is whether the State interest is outweighed by a national interest in the unhampered operation of interstate commerce."

In the Castle case, the Court said, 348 U.S. at page 63, 75 S.Ct. at page 192:

"Congress in the Motor Carrier Act adopted a comprehensive plan for regulating the carriage of goods by motor truck in interstate commerce. The federal plan of control was so all-embracing that former power of states over interstate motor carriers was greatly reduced. No power at all was left in states to determine what carriers could or could not operate in interstate commerce. Exclusive power of the Federal Government to make this determination is shown by § 306 of 49 U.S.C., 49 U.S.C.A. § 306 which describes the conditions under which the Interstate Commerce Commission can issue certificates of con-

venience and necessity. And § 312 of the same title provides that all certificates, permits or licenses issued by the Commission 'shall remain in effect until suspended or terminated as herein provided'."

■ It is apparent that Congress, by the enactment of the 1938 Aeronautics Act, adopted a comprehensive plan for the regulation of air traffic in the navigable airspace.

The intent of Congress to preempt the regulation of commerce by comprehensive legislation was so held in the cases of Rice v. Santa Fe Elevator Corp., 1947, 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447; Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 67 S.Ct. 1026, 91 L.Ed. 1234, and Garner v. Teamsters Union, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228.

The plaintiffs' contention that the legislative action by the Congress together with the regulations, adopted pursuant thereto, have regulated air traffic in the navigable airspace in the interest of safety to such an extent as to constitute preemption in that field is upheld. The States, including the Village of Cedarhurst, are thus precluded from enacting valid contrary or conflicting legislation.

The fact that various States have legislated in the field of air traffic regulation is no indication that Congress did not intend to preempt the field. On the contrary, the existence of the various state laws on the subject and the adoption of the Uniform Aeronautics Act by a number of them, prior to the enactment of the Civil Aeronautics Act in 1938, point toward an intent of Congress of preemption in the interest of uniformity as a prerequisite of safety.

Federal control and regulation of traffic in the navigable airspace includes the airspace through which aircraft necessarily fly for take-offs from and landings at public airports.

The defendants do not question that the Aeronautics Act of 1938 declared the airspace of 1,000 feet above the land surface to be navigable airspace. They contend, however, that airspace below 1,000 feet is not navigable airspace, that the Statute does not concern itself with such airspace and that the State, or the Village has jurisdiction over it.

The defendants also contend that Congress, by the Air Commerce Act of 1926 and the Civil Aeronautics Act of 1938, recognized that the airspace of not less than 1,000 feet over congested areas was navigable airspace and that the airspace under 1,000 feet was not navigable airspace and was not regulated by Congress.

Section 10 of the Air Commerce Act of 1926, now 49 U.S.C.A. § 180, provided as follows:

"Navigable Airspace. As used in this Act, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Secretary of Commerce under Section 3, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of this Act."

Similar provisions were contained in the Act of 1938, 49 U.S.C.A. §§ 401(24), 403, 551(a) (7) excepting that the power to make air traffic rules "including rules as to safe altitudes of flight" was thereby vested in the Civil Aeronautics Board, instead of the Secretary of Commerce.

The defendants claim that rules governing safe altitudes of flight, adopted by the Secretary of Commerce under the 1926 Act and by the Civil Aeronautics Board under the 1938 Act, prescribed the minimum safe altitude of flight over congested areas at not less than 1,000 feet. The rule so alluded to under the 1926 Act, insofar as relevant, reads as follows:

"Height over congested and other areas. Exclusive of taking off from or landing on an established landing field, airport, or on property desig-

nated for that purpose by the owner * * * aircraft shall not be flown: (1) over the congested parts of cities, towns or settlements except at a height sufficient to permit of a reasonably safe emergency landing, which in no case shall be less than 1,000 feet."

It is apparent that the said 1926 rule, requiring air pilots to maintain altitudes of at least 1,000 feet did not apply to aircraft engaged in take-offs or landings. That altitudes for making landings at and take-offs from airports must vary in accordance with conditions in and around each airport, is indicated in the Senate-House Conference report on the bill, which became the Act of 1926, viz.:

"11. Navigable Airspace.—The House bill provides a public right of freedom of interstate and foreign air navigation in the navigable airspace similar to the public right of such navigation upon navigable waters. Such navigable airspace comprises the airspace above the minimum safe altitudes of flight prescribed by the Secretary of Commerce. These altitudes would vary with the terrain and location of cities and would coincide with the surface of the land or water at airports. The power to fix the various altitudes was, therefore, left to the discretion of the Secretary of Commerce, having regard to the above mentioned and other relevant factors."

The rule, adopted by the Civil Aeronautics Board under the 1938 Act, prescribing minimum altitudes of flight, in force at the time of the commencement of this action, insofar as relevant, reads as follows:

"60.17 Minimum safe altitudes. Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes:

*   *   *   *   *   *

"(b) Over congested areas. Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons an altitude of 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft * * *."

█ It is plain that when aircraft descend for landing at an airport or take off therefrom, they must necessarily fly below an altitude of 1,000 feet and that landings and take-offs are part of the operation and flight of aircraft. The obvious meaning of the rule is that the minimum safe altitude for take-off or landing is whatever altitude is necessary for those operations. The Court construes the words "except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes" as establishing a minimum altitude rule of specific applicability to aircraft taking off and landing. This also is the interpretation adopted by the Civil Aeronautics Board on July 22, 1954. In support of the plaintiffs' allegation that such operations are necessary, they produced the testimony of a number of air pilots and other experts to the effect that, in accordance with normal procedures and in the interest of safe operations, occasionally aircraft using Idlewild necessarily must fly over Cedarhurst below 1,000 feet, but never below 450 feet. No satisfactory substitutes were suggested by the defendants. Paragraph 4 of the Cedarhurst Ordinance makes such flights unlawful. The witnesses also testified that in their opinion, the enforcement of the ordinance would substantially restrict the operation of aircraft in interstate and foreign commerce to and from Idlewild and would, at times, result in the complete shutting down of the airport; that no other airport in the New York and New Jersey region could handle the overseas air traffic to and from this area and that if other villages and communities, adjoining the airport, should pass similar ordinances, the airport for all practical purposes would cease to function.

As to the defendants' claim that Congress unlawfully delegated authority to the Civil Aeronautics Board to adopt a rule, fixing the minimum safe altitudes of flight of aircraft.

The defendants contend that the aforesaid regulation 60.17 constitutes legislation and that Legislative powers are vested in Congress, and in no other body, under Article I, Section 1, of the United States Constitution. They do not challenge the rule, as set forth in numerous cases, to the effect that Congress may empower an administrative agency such as the Civil Aeronautics Board to make rules, provided, however, that Congress declare its policy with sufficient clarity and definable standard so as to establish a definite course whereby the administering agency, by rules and regulations, may fulfill the Congressional intent. The defendants further maintain that by failing to define or furnish a guide as to its meaning of "minimum safe altitudes", the title of the regulation, Congress permitted the said Board to actually make the law.

The plaintiffs and the intervenors assert that the necessary standard is contained in the word "safe".

The said regulation is a direct result of Title VI of the Act of 1938, 49 U.S.C.A. § 551, entitled "Civil Aeronautics Safety Regulations", providing in section 601(a)(7), 49 U.S.C.A. § 551(a)(7), that the Board is:

" * * * empowered, and it shall be its duty to promote safety of flight in air commerce by prescribing and revising from time to time * * * air traffic rules governing the flight of * * * aircraft, including rules as to safe altitudes of flight * * *."

The said section of the 1938 Act seems to flow from Section 10 of the Air Commerce Act of 1926, 49 U.S.C.A. § 180, also from Section 1(24) of the Civil Aeronautics Act of 1938, 49 U.S.C.A. § 401(24), which make the definition of navigable airspace contingent upon the determination by the Board of the "minimum safe altitude" of flight.

Section 2 of the 1938 Act, 49 U.S.C.A. § 402, prescribes the policy that the Board shall follow in the performance of its duties, including:

"The regulation of air transportation in such manner as to * * * assure the highest degree of safety in * * * such transportation * * *."

"The regulation of air commerce in such manner as to best promote its development and safety * *."

Congress clearly declared its policy to be one of safety and specifically demanded that this rule be adopted in fulfillment of that policy. A delegation to the said Board to draft this rule, dependent upon its findings, was valid. See Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624; Hampton & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Lichter v. United States, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; St. Louis, Iron Mountain & Southern Railway Co. v. Taylor, 210 U.S. 281, 28 S.Ct. 616, 52 L.Ed. 1061; The Aurora v. United States, 7 Cranch 382, 3 L.Ed. 378; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446.

As to other contentions
of the defendant.

The defendants claim that the so-called August 1950 traffic pattern for Idlewild was illegally adopted. That pattern superseded an earlier one, in effect between February 3, 1949 and August 1950, providing for the routing of aircraft to and from Runway 4 over the old Valley Stream airport to the north of and outside of the Cedarhurst area. The evidence established that the earlier pattern was unsafe, particularly as to some aircraft operating under certain weather-

conditions. The administrator's revised pattern, the new pattern, known as Regulation 60.18–2, as stated therein was adopted "to promote safety", 15 F.R. 5046. The defendants assert that the latter pattern is detrimental to the interests of the Village of Cedarhurst and increases air traffic over the Village and that it was not enacted in conformity with the procedure prescribed in the Statute, 5 U.S.C.A. § 1003, in that notice of it was not given to all interested persons, as was the case when the prior pattern was made, but only to representatives of the pilot associations. The plaintiffs pointed out that, under the Statute, such notice need not be given "in any situation in which the agency for good cause finds [and incorporates such finding in the rule together with a brief statement of the reasons therefor] that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Examination of the amended pattern or rule discloses that such requirement was met by incorporating therein the provisions that the amendment "is adopted without delay in order to promote safety of the flying public" and that "compliance with the notice, procedures, and effective date provisions of Section 4 of the Administrative Procedures Act, also known as 5 U.S.C.A. § 1003, would be impracticable and contrary to the public interest, and therefore is not required".

█ The defendants place considerable reliance upon the so-called airspace reservation in Washington, D. C., and apparently claim that a similar reservation should apply to the Cedarhurst area. The Washington airspace reservation is a prohibited airspace, above the Governmental structures, north of Washington National Airport, established by Presidential Order, E.O. 10126, 15 F.R. 2867 U. S. Code Cong. Service 1950, p. 1605. The Cedarhurst area has not been legally designated as an airspace reservation. Furthermore, the evidence demonstrated that the conditions at the Washington and Idlewild Airports have nothing in common. Idlewild Airport is primarily used in long range transcontinental and oceanic operations. Many of the aircraft there operating do so with loads of passengers, cargo and gasoline up to the limits of their permissible gross weights, while at the Washington Airport, the main operations are for shorter hauls and with much lighter gross weights, thus making it possible to avoid the reservation. The heavier loaded planes could not do so.

## Congress has not, by statute, recognized private rights in airspace.

█ The defendants further contend that Congress recognized private rights in the airspace above the land in enacting a statute, authorizing condemnation of airspace easements. The Statute, so referred to, 49 U.S.C.A. § 452(c), insofar as applicable, sets forth:

"The Administrator, on behalf of the United States, is authorized * * * to acquire * * * by condemnation * * * in the case of air-navigation facilities (including airports) owned by the United States and operated under the direction of the Administrator, easements through or other interests in airspace immediately adjacent thereto and needed in connection therewith; * * *. Any such acquisition by condemnation may be made in accordance with the provisions of the Act of August 1, 1888 (40 U.S.C. 257) * * *. Provided, That in the case of condemnations of easements through or other interests in airspace, in fixing condemnation awards, consideration may be given to the reasonable probable future use of the underlying land."

It will be noted that the Statute does not apply to Idlewild Airport nor to any other airport, not owned by the United States.

The defendants assert that the Government, in several condemnation actions in this court, took avigation easements, under the Statute or the general condemnation statute, thereby recognizing

the rights of the ground owner to the airspace above his property. One of those actions was entitled, United States v. 26.07 Acres of Land, Civ.Proc. No. 86. As appears from the Court's opinion therein, reported in D.C., 126 F. Supp. 374, 375, the Government took certain avigation easements by eminent domain in connection with the military airport at Mitchell Field on Long Island, in the airspace over property of neighboring landowners, varying in altitude but not exceeding a height of 36 feet above ground level. The Government's purpose and the limited nature of the easement is described in the opinion, viz.:

" * * * for the establishment and use of a glide angle plane for the flight of aircraft at an angle of fifty to one with the ground; including the continuing right in the United States to cut timber, remove buildings, and clear the zone of any and all obstructions extending above the glide angle plane and including the right of ingress and egress to and from the land to effect and maintain the necessary clearance; reserving however, to the land owner, and his heirs and assigns, all such rights and privileges as may be used and enjoyed without interfering with or abridgement of the easement acquired by the United States."

It is true that the landowner has rights in the airspace above his property and the Statute must have been enacted with that thought in mind. In the Causby case, supra, the Court recognized such ownership to be "at least as much of the space above the ground as he (the landowner) can use or occupy in connection with the land", also that "the airspace apart from the immediate reaches above the land, is part of the public domain". Under those circumstances, the Government, as to Mitchell Field, and in the second case, hereinafter referred to, sought the easements so as to prevent the owners from erecting structures on

their property which might interfere with the use of the airports. The Statute conforms with the principles of the Causby case in that it applies only to the acquirement of easements "in airspace immediately adjacent thereto (to the airport) and needed in connection therewith". In the second of the said actions, entitled United States v. 4,475.-23 Acres of Land, Civ.Proc. No. 84, the filed papers show that the Government is taking various parcels of land, including as to one of those parcels a permanent avigation easement with the restriction on the use of the surface of that parcel that no structures be constructed exceeding 100 feet in height above sea level.

The defendants erroneously contend that Administrative Order, known as TSO-No. 18, resulted in the digging of an air channel over Cedarhurst as low as 162 feet, without compensation to the underlying landowners. On the contrary, it appears that the order was merely issued as a means of identifying those structures, which because of their height and geographical position near airports might constitute hazards to air navigation. Having so identified them, an effort is then made to mark such obstructions and to establish minimum altitudes so as to provide ample safety buffers above them. The order, apparently, has no relevancy. Furthermore, there is no evidence in this case of flights made as low as 162 feet above ground level. In fact, as previously stated, no flights have been made below an altitude of 450 feet.

The contentions, so made by the defendants, have no merit.

Accordingly, the aforesaid ordinance of the Village of Cedarhurst is declared unconstitutional and void and the defendants are permanently enjoined and restrained from enforcing it. No costs are allowed. Submit decree on ten days' notice.