50 N.J. Super. 127 (1958)
141 A.2d 335
RALPH SANS AND MITZI SANS, PLAINTIFFS-RESPONDENTS,
v.
RAMSEY GOLF AND COUNTRY CLUB, INC., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1958.
Decided May 12, 1958.
*129 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. James A. Major argued the cause for defendant-appellant (Mr. James M. Muth, attorney).
Mr. Walter D. Van Riper argued the cause for plaintiffs-respondents (Messrs. Van Riper and Belmont, attorneys).
The opinion of the court was delivered by CONFORD, J.A.D.
Defendant was enjoined in the Chancery Division from the use of the third tees (one men's, the other women's), as presently located on its golf course. Plaintiffs' home is some 50 feet from these tees, their rear property line somewhat closer. The trial court found that the use of the tees for golfing purposes involved "the extreme invasion of the peace and quiet of the plaintiffs' home," and also, in effect, constituted a denial to plaintiffs of the right to the use of a lake on the defendant's property in which plaintiffs were deemed to have certain privileges by virtue of arrangements hereinafter described.
Defendant's golf course, as well as plaintiffs' property, are part of a combination residential and "country club" development in the boroughs of Ramsey and Allendale, Bergen County, planned and executed during the 1940's by a New York organization incorporated as National House and Farms Ass'n., Inc. (referred to hereinafter as "National"). Exhibit P-17 in evidence is a map which shows the projected layout. A nine-hole golf course was laid out in the center of the western portion of the development, and this is shown on the map to be surrounded by numbered residential lots on all sides of it. There are also two or *130 three lakes and other recreational facilities. The plan was that every purchaser of a home or lot in the development had the right of membership in the country club and the common use of its facilities. Later non-residents of National's development tract were permitted to be admitted to club membership.
The defendant was incorporated to operate the golf club, and in 1945 National conveyed to it the golf course and recreational areas, including the lakes. The deed was made subject "to the riparian rights of present or future owners" of certain lots, including those now owned by plaintiffs. Plaintiffs purchased lot 53, block 7, as shown in the map aforementioned, from National in 1949, and also two adjoining lots after they built their home on lot 53. The map, which indicates the general layout of tees and holes on the golf course, shows no tee at the present location of the third tees. Plaintiffs' deeds grant no riparian or other rights in relation to any body of water. The property conveyed to them lies close to the northern end of Mirror Lake, a part of defendant's holdings. Their property line does not, however, go to the lake shore. There is an intervening narrow strip of land, title to which was retained by National and conveyed to the defendant in 1955. Since then defendant's golfing members have used this strip in getting access to the third tees. Previously they walked across plaintiffs' land.
The present men's third tee was constructed in 1948. It was used continuously thereafter, but plaintiffs say they did not notice it until they were actually erecting their home in 1950. Mr. Sans testified that an officer of the club told him at the time that he could stop the use of the tee at any time. The placement of the third tees where they now are situated was done in order to give the course a "water hole" of par-4 length. The hole is played across the narrow end of Mirror Lake. If the tees were removed to the other side of the lake, the water hazard would be removed and the distance to the cup would be considerably shortened. The hole would become par 3, and it was testified on behalf of defendant that this would be undesirable *131 from a golfing standpoint. The first year or so after plaintiffs moved into their new home they made no complaint about use of the third tees, but as time went on and the membership of the club increased the extent and nature of the use of the tees became increasingly offensive to plaintiffs, and they complained to the defendant's officers frequently, but to no avail until the agreement of April 1955, mentioned hereinafter, was entered into.
The incompatibility between normal family use of plaintiffs' home and the club use of the third tee has been manifested in many ways. The course is played during the entire day, and summer play, particularly on week-ends, is from 6 A.M. to 8 P.M. Plaintiffs are frequently awakened by golfers in the early mornings. At times there are as many as 12 people at the tee, close to plaintiffs' back yard, waiting their turn to "tee off." When plaintiffs' young children play around the house they are scolded by the golfers, who require absolute silence and immobility of everything in sight during the ritual of the pre-swing address of the ball, and, of course, during the critical moment of the swing itself. On one occasion an irate golfer clubbed plaintiffs' dog unconscious for barking while on plaintiffs' own property, when their child could not quiet the animal. Sometimes golfers bring their own dogs along and these attack plaintiffs' dog. The diverse sounds and voices of people at or near the tee at all hours envelop plaintiffs' home continuously. They cannot use their own back yard, which faces the lake, in any degree of privacy. Plaintiffs' leisure hours coincide with times of peak attendance by golfers. When they water their lawn golfers complain because the adjoining footpath becomes muddy. Mr. Sans testified: "We never feel relaxed or free at home. There is always someone in our back yard." Mrs. Sans has become so distraught over the situation as to require medical treatment.
Plaintiffs also complain that their children cannot boat or skate on the lake with freedom, for fear of being struck by golf balls. They maintain this interferes with their right to recreational use of the lake.
*132 After many complaints by plaintiffs a written agreement was entered into by the parties April 8, 1955, under which the third tees would continue to be used by the club temporarily at reasonable hours, the agreement stating that the parties anticipated that plaintiffs would acquire the lakefront strip and the club would later that year extend the course and remove the tees. The latter steps never eventuated. Defendant decided it would cost too much to extend the course. Moreover, it acquired the strip from National itself instead of permitting plaintiffs to do so. The arrangement for reasonable hours of use of the tees is no longer being observed.
Defendant's first ground of appeal is that the decision is without support in the complaint or pretrial order. The complaint is for trespass q.c.f. and for enforcement of alleged agreements with National and with defendant. The pretrial order, however, goes further and states among the issues to be tried: "2. Do the defendants, its members and guests interfere with the plaintiffs' use and enjoyment of their property; 3. Do the plaintiffs have any rights in and to Mirror Lake and the marginal area around said lake." Moreover, at the outset of the trial plaintiffs made known that their position was that the presence of the tee and the manner of its use by defendants was a nuisance. Defendant offered no objection, and, since the case was clearly tried on that theory, and our affirmance of the judgment will rest on the same cause of action, this point of appeal is without substance. R.R. 4:15-2; Barber v. Hohl, 40 N.J. Super. 526, 533 (App. Div. 1956).
We are in accord with defendant's second ground of appeal  that there was no unlawful interference with plaintiffs' rights to use Mirror Lake. The reference to riparian rights of lot owners in the deed to defendant is of nebulous significance, for present purposes. National may at one time have entertained the notion of giving lakeside lot owners special rights of use of the lake, but such a plan was apparently never effectuated. In any case, no rights in reference to the lake were specified in the plaintiffs' deeds. *133 All they received in respect to lake rights was the common right of all country club members to use the lake for recreational purposes, incidental to membership in the club, not by reason of their land title. In this regard the use of the lake was subject to reasonable regulation by the club, including the right of the club to make the use of the property, including the lake, for golf purposes primary, and for other recreational purposes secondary. This was not unreasonable as golf is obviously the principal recreational objective of the defendant organization. In that light, it was reasonable for the defendant to bring the lake into the schematic architecture of the third hole as part of a water hole, and any incidental inconvenience in plaintiffs' use of the lake for other purposes was not actionable. Thus, to the extent that the judgment of the trial court was based on impairment of plaintiffs' rights in the lake, it is not well founded.
However, our review extends to the judgment, not merely to the supporting opinion. We deem the injunction well founded in a cause of action for private nuisance. The trial court's oral conclusions indicate this theory played a coordinate part in the determination.
The remedy at law or in equity for private nuisance is broad and flexible. It is founded in the maxim, sic utere tuo ut alienum non laedas. "Every person is bound to make a reasonable use of his property so as to occasion no unnecessary damage or annoyance to his neighbor." Campbell v. Seaman, 63 N.Y. 568, 577 (Ct. App. 1876), quoted in 1 Harper and James, Law of Torts (1956), § 1.24, p. 71. At an early date in our law it was stated: "Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained * * *." Cleveland v. Citizens Gas Light Company, 20 N.J. Eq. 201, 205 (Ch. 1869). The number of ways in which the manner of use of one's property can become so offensive to others as to warrant judicial relief, although not unlawful per se, is manifold. See 1 Harper and James, op. cit., supra, § 1.24, pp. 69, 70.
*134 The leading modern New Jersey case is Benton v. Kernan, 130 N.J. Eq. 193 (E. & A. 1941). The court there was concerned with the commonly implicated nuisance of noise, but its quotation with approval from a Massachusetts case appears to us to provide the broadly controlling consideration in any type of alleged nuisance (130 N.J. Eq. at page 198):
"* * * noise becomes actionable only when it passes the limits of reasonable adjustment to the conditions of the locality and the needs of the maker to the needs of the listener. What those limits are cannot be fixed by any definite measure of quantity or quality. They depend upon the circumstances of the particular case." (Emphasis added.)
See also Damadio v. Levinsohn, 111 N.J. Eq. 84 (Ch. 1932); Kosich v. Poultrymen's Service Corp., 136 N.J. Eq. 571 (Ch. 1945); Lieberman v. Saddle River Tp., 37 N.J. Super. 62 (App. Div. 1955); cf. State v. New York Central Railroad Co., 37 N.J. Super. 42, 49 (App. Div. 1955); 4 Restatement, Torts, §§ 822-831.
In the present case we find a strangely anomalous kind of asserted nuisance, in that the objectionable condition consists not merely of the sights and sounds of what transpires on defendant's property, but in that plaintiffs' reasonably ordinary use of their own property is so offensive to the users of defendant's lands as to engender continual strain, discomfort and friction on both sides of the line. The sounds and activities ordinarily concomitant with everyday living in and about plaintiffs' property are incompatible with the requisite for peace of mind of the nearby golfers about to swing. At the same time, the time and nature of the ordinary activities of golfers at or in the vicinity of the tee were bound, as the evidence indicates actually happened, to wreak havoc with plaintiffs' comfort and reasonable sensibilities as ordinary human beings. The pertinent inquiry is whether defendant's activities materially and unreasonably interfere with plaintiffs' comforts or existence, "not according to exceptionally refined, uncommon, or luxurious habits of living, but according to the simple tastes and unaffected notions generally prevailing among plain *135 people." Stevens v. Rockport Granite Co., 216 Mass. 486, 104 N.E. 371, 373 (Sup. Jud. Ct. 1914); see also Lieberman v. Saddle River Tp., supra, 37 N.J. Super. at page 67. By these standards we think plaintiffs proved a cause of action here.
It has been said that a nuisance may consist of the right thing in the wrong place  "like a pig in the parlor instead of the barnyard." Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 388, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In the present case the proofs leave no room for doubt that either the defendant's third tee or plaintiffs' house is in the wrong place. If it is the tee, the plaintiffs should retain the relief granted them in the Chancery Division. We think this is the case here. The defendant received its property on the basis of an integral plan whose paramount object was the creation of a residential community. The golf course was for the convenience of the dwellers, rather than vice-versa. Defendant is the gratuitous grantee, and, in a sense, the instrumentality of the grantor-developer. It stands in the latter's shoes, vis-a-vis the plaintiffs, and, in all equity, National owed plaintiffs a reasonably habitable location in the lots it sold them. While it is true that purchasers of home plots bordering the golf course must be held to have taken them subject to the ordinarily incidental discomforts of such proximity, such as the hazards of stray golf shots, yet at the same time the defendant and its creator, National, were reasonably bound to lay out their golf course with fair regard to the minima of residential comfort and convenience for the occupants of plots laid out along the borders of the course and sold for dwelling purposes as part of a common project. The present location of the third tee fails to meet this obligation, to the grievous and irreparable injury of plaintiffs if defendant is not enjoined. The balance of equitable convenience in requiring defendant to rearrange its golf layout in respect to the third tee, as against leaving the plaintiffs to continue to suffer as heretofore, seems to us to lie heavily in favor of the former alternative.
Affirmed.