108 N.J. Super. 461 (1969)
261 A.2d 692
TOWNSHIP OF HANOVER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; TOWNSHIP OF MORRIS, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; BOROUGH OF FLORHAM PARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; A. STEWART DUNFORD; THOMAS E. KENNEY; MARTIN B. MONROE; JOSEPH ELSMAN; JOHN E. FLAHERTY; NORMAN S. WEINBERGER, PLAINTIFFS,
v.
THE TOWN OF MORRISTOWN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND THE MORRISTOWN AIRPORT COMMISSION, DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided December 10, 1969.
*464 Messrs. Harry L. Sears and John D. Mills for plaintiffs.
(Messrs. Young and Sears, Attorneys for Twps. of Hanover, Borough of Florham Park, A. Stewart Dunford, Thomas E. Kenney, Martin B. Monroe, Joseph Elsman, John E. Flaherty, Norman S. Weinberger).
(Messrs. Mills, Doyle and Muir, Attorneys for Township of Morris and Borough of Madison).
(Messrs. Crummy, Gibbons & O'Neill, Attorneys for Newark Air Services, amicus curiae).
Mr. Edward F. Broderick, Jr., for Defendants, The Town of Morristown and the Morristown Airport Commission.
STAMLER (JOSEPH H.), J.S.C.
(For publication purposes, the following statement of facts is an abstracted version of those set forth at length in the Court's original Opinion in this case.).
This is an action in which plaintiffs seek a permanent injunction forbidding certain planned physical alterations and extensions of facilities at Morristown Municipal Airport or, in the alternative, a direction of the court curtailing use and operation of the airport.
Plaintiffs are four municipalities, Township of Hanover, Borough of Florham Park, Township of Morris and Borough *465 of Madison, and six individuals who either reside or are employed in one or another of the plaintiff municipalities. Defendants are the Town of Morristown and the Morristown Airport Commission.
The Town of Morristown owns the Morristown Municipal Airport, consisting of approximately 595 acres of land situated in the Township of Hanover. Control and operation of the Airport is vested in the Morristown Airport Commission, a commission created by the ordinance of the Town of Morristown in 1949. The Borough of Florham Park abuts to the south and east; The Township of Morris to the west. Located to the south of the Airport and Florham Park is the Borough of Madison.
Morristown Airport was constructed just prior to the beginning of World War II. Subsequent to the war's end, use of the airport's facilities increased with each passing year. Not only did more planes use the airport, but also aircraft engines became more powerful and increasingly noisy.
Municipalities in Morris County, including plaintiff municipalities immediately adjoining the Airport, experienced rapid growth in residential areas, industrial development and transit systems on the ground and in the air. The Township of Hanover adopted a Master Plan in 1963 which acknowledged that additional improvements and plans for expansion at Morristown Airport were anticipated. Florham Park adopted a General Development Plan in 1960 which made no specific reference to Morristown Airport from a planning or zoning standpoint. Morris Township has no Master Plan. No evidence as to any master or zoning plan as to Madison was introduced at the trial.
As an incident to the increased activity at Morristown Airport, a navigational aid for locating the Airport in inclement weather was installed in the 1950's. This system, known as automatic direction finding (A.D.F.), utilizes a radio beacon as a homing device described by today's experts as a "Mickey Mouse" affair. The transmitter, which *466 is situated in Chatham Township, is still in use today. When utilized as a homing signal for Morristown Airport on days of low visibility or at night, planes homing on the device arrive over the beacon transmitter and then proceed on a specified compass course in the direction of the Airport until safe landing instructions are directed by the control tower. This course takes the aircraft almost directly over what is now Fairleigh Dickinson University (Madison campus) and a little to the east of the College of St. Elizabeth. In addition, the Chatham beacon is also used by scheduled airlines as a navigational localizing fix and holding point for approaches to or departures from Newark Airport.
Morristown Airport still has today the two original runways layed out in 1940, each 4,000 feet in length. One, designated "5-23", runs in a northeast-southwest direction; the other, designated "12-30", runs northwest to southeast. In the late 1950's, the Airport Commission and the Town of Morristown determined that additional improvements, as recommended by the Federal Government's National Airport Plan, were needed. A Master Plan and General Layout Plan were prepared in April 1960, and were submitted to the Federal Aviation Agency (hereinafter, F.A.A.) in June 1960. The plan in one phase specifically called for the lengthening of runway 5-23. General information as to the plans for improvements at Morristown Airport came to the attention of the officials of the neighboring communities, as well as to officials in County, State and Federal Government. Additional improvements planned consisted of a new control tower, new aircraft taxiways, new lighting improvements, and installation of an instrument landing system (I.L.S.).
In April 1967 Morristown, with the approval of the New Jersey Bureau of Aeronautics, submitted a request to the Federal Government for financial assistance by way of grant to complete the 1960 Master Airport Plan. The F.A.A. took favorable action in the form of two projects which *467 were thereafter combined into one, with an estimated total cost of $2,734,480.
Many governmental agencies were actively engaged in considering the proposed plans. The geographic location, the nature of the services performed and to be performed in the future and the types of aircraft were among the many factors reviewed by F.A.A., Tri-State Transportation Commission, New Jersey Bureau of Aeronautics, Morris County Aviation Commission and the Morris County Planning Board. The New Jersey Departments of Transportation and Community Affairs were informed of the proposed improvements. Informal conferences were held with various officials of Hanover Township, East Hanover, Florham Park and Morristown. This was done to keep the neighboring communities abreast of what was intended to be accomplished. Final plans and specifications were submitted to F.A.A. in September 1968.
Objections to the proposed improvements raised by plaintiffs in the instant action and by other local citizens resulted in a meeting before the F.A.A. in December 1968. Subsequently, a public hearing was held at F.A.A. offices in Newark, New Jersey on March 1, 1969, in compliance with 49 U.S.C.A. § 1108 (d) 3. The hearing examiner concluded that in furtherance of the National Airport Plan, the needs of Morristown Airport required the improvements and that no substantial harm would come to any of the surrounding communities or their residents. The examiner also found that the anticipated noise after improvements would not reach levels that would affect the health and comfort of ordinary people living or working in the vicinity of the Airport.
A contract was entered into under which the Federal Government agreed to contribute one-half of the $2,700,000 for the implementation of the plan. Defendants thereafter advertised for bids for construction of the improvements. On July 14, 1969 bids were received and reserved for study by the governing body of Morristown. At or about the *468 same time the Airport Commission and the Town entered into a lease with Newark Air Service (NAS) which under its terms permitted NAS to use a part of Airport property for maintenance and service of aircraft.
The present suit was then instituted. An order to show cause issued requiring the defendants to show cause on September 12, 1969 why an injunction should not be granted pending final hearing in the matter. With consent of all parties, the court granted a limited injunction. On the return day, recognizing the public interest and the necessity for an early determination, the court fixed September 18, 1969 for pretrial conference and October 14, 1969 as the trial date. On September 18 at the pretrial conference, a motion was made by defendants to modify the interlocutory injunction theretofore entered, and with the consent of plaintiffs the injunction was modified. The matter came on for trial on October 14, 1969. NAS sought and was granted leave to file a brief amicus.
The evidence adduced at trial comprises a vast number of complex documentary exhibits and testimony of lay and expert witnesses. The lay witnesses included twenty-two citizens, whose residences or places of employment were located in close proximity to the Airport and its operations. Generally their complaints were apprehension of crash and intolerable noise.
In the context of this case and unscientifically, noise may be described as unwanted sound. It can hardly be described as a new evil lately come upon us. Many, many years ago citizens complained of the pounding on the anvil by the blacksmith, the irritable rasp of the grindstone upon which swords and scissors were sharpened, the carpenter's hammering home the crudely forged nail, or the clatter of the iron-shod hooves of horses on the cobblestone streets of the city. In about 1750, in what we today might think of as the tranquil colonial city of Philadelphia, Benjamin Franklin determined that he must move to Second and Sassafras Streets from High Street because "the *469 din of the Market increases upon me; and that, with frequent interruptions, has, I find, made me say some things twice over." However, looking forward to the blessings of civilization, one of which is purportedly progress, the citizen grudgingly accepted the fact that some noise must be tolerated.
In the past, noise for the most part was concentrated in the cities; man began to leave for the suburbs to seek a tranquil existence. But with the coming of multi-laned super-highways and the trucks and other high-powered vehicles criss-crossing suburban and rural districts, the unwanted sounds, on the increase in the cities, also followed people to the country. On both sides of the highway as it passed through suburbia, those who had sought rural quiet either accepted the noise or moved further back from the edge of the road.
Aviation industry progress continues onward and upward. From the "putt-putt" of the single 70 hp. engine on light canvass-covered aircraft, through the era of the piston-engine propellor plane, to today's shrill whine of heavy, multi-engine jets, civilization advanced over the roof of the house which had reluctantly backed away from the highway.
Noise, including aircraft sound, is no less an environmental pollution than the smog and smoke that pollutes the air or the debris which poisons our lakes and rivers. It is the most difficult form of pollution to control. No one would expect that man should continually live inside his home with all doors and windows tightly shut or walk the streets or the fields with fingers in his ears or wear accoustical ear muffs, such as those employed on the flight line at an airport. It is regretfully concluded that the unwanted ambient noise, including noise emission from aircraft on the ground and in flight, will always be with us. The search is for the zone of unacceptable annoyance and a determination of what, if anything can be done in attenuation.
*470 The twenty-two citizens who testified came from all walks of life. Distillation of their complaints reveals that intrusiveness of unwarranted sounds from aircraft, both on the ground and in flight, caused apprehension, annoyance and anxiety. This was especially true in the early hours of the morning (6:30 to 7:00 A.M.) and late hours in the night (11:00 to 11:30 P.M.). Almost all of the citizens had purchased their homes with knowledge of the close proximity of the already existing airport, but some had assumed that it was "a small country airport" which would always remain just that. Others acknowledged that they had moved into mushrooming new developments of homes upon which construction had begun some 20 years or more after the Airport's opening. There was no testimony that the values of their homes had depreciated, or that they intended to sell because of the Airport noise.
Each of the residents was most annoyed that complaints, when registered with the Airport Management or F.A.A., seemed to fall on deaf ears. They wanted action and received none, although it was apparent to them that violations of Airport rules and F.A.A. regulations had been committed on numerous occasions. Fears of a crash into their homes of the rumbling and whining aircraft close overhead are not allayed by Morristown Airport's enviable safety record.
There has been much supposition and alarm. In summation, counsel for defendants, acknowledging the sincerity of the citizens who testified, admitted that "all of the blame cannot be laid at the door of the plaintiffs." It is assumed that this admission was made not only as to the citizen-plaintiffs, but also the zoning and planning officials of the municipalities. Much of the conjecture of both groups of plaintiffs was born from a dearth of accurate information. This information would have assisted the land-use planners in the adjoining municipalities, and also would have explained away some of the wild rumors which circulated among local citizens.
*471 Evidence at trial projected an increase in annual aircraft movements at Morristown Airport from 200,000 in 1960 to 380,000 in 1980; from a current 1,500 to 35,000 movements of jets whose weight exceeds that of the business-type piston aircraft. The Airport's concern with expansion, therefore, is solely beneficent in arguing for safety. It, too, has an eye on gross income return, especially since by law it cannot be a deficit operation, and the proposed improvements will certainly attract additional users. Experts say that by 1980 the field will have reached its "saturation point" as to use.
Much of the expert testimony on aircraft operations and accoustical disturbances was based on projections. These are not much more than peering into the same crystal ball with rose-colored glasses by defendants and smoke-clouded glasses by plaintiffs. However, of particular relevance is the comparison of the present categories of users of the Airport compared to the "mix" anticipated in the future. Projections demonstrated that the principal beneficiaries of the Airport after the contemplated improvements would be in the "business" category, variously described as "executive type aircraft" or "corporate jets." It becomes obvious that with the increased use of planes, especially in the "business" category, will come increased noise disturbance.
F.A.A., which has primary responsibility for a solution to the problem of aircraft noise, has not as of this date created any definitive standards for land use planning as it is related to aircraft noise. In addition, many other agencies of government on Federal and State levels are now working together on an aircraft noise abatement program. Furthermore, there was also testimony at trial that improvements in aircraft design technology will hopefully lead to reductions in noise at the source, that is, in the aircraft engine itself. The F.A.A. considers the noise problem second only to safety, and insofar as safety is the *472 prime consideration as to aircraft operating procedures, this Court cannot supersede the expertise of the F.A.A.
However, within the area of limitation of hours of operation, safety factors do not come into play, and with this variable the Court may properly concern itself. It was suggested by documents marked in evidence that F.A.A. considers the following as within the scope of limitations of operations: "(1) night movements can be restricted to reduce over-all noise exposure; (2) gross weight or stage-length maximums can be established to reduce operation power requirements; (3) number of operations per day can be restricted to reduce over-all noise exposure; (4) type of aircraft can be controlled at noise sensitive airports."
From the proofs in this case there can be no question but that Morristown Airport is a "noise-sensitive airport." F.A.A. indicates that runway use has a strong influence on community noise exposure. The preferential runway plan, utilizing runway 5-23 at Morristown Airport, is hopefully one means of noise abatement, and this preference can be utilized if 5-23 is extended. F.A.A. further suggests that engine run-up noise can be a primary source of annoyance to nearby residential communities. This can be reduced by the use of remote locations, aircraft orientation, runway noise barriers, moveable or fixed ground suppressors for engine run-up and restrictions on hours during which engine testing is permitted.
Prior to summations, the Court, at the request of all parties, visited the Airport for a site and flight inspection. Counsel and one expert for each side accompanied the Court in a flight over some of the areas in which the citizen-plaintiffs resided. Simulated I.L.S. landings were also conducted. Immediately upon returning to the Airport Operations Office, the impressions of the attorneys and of the Court were placed upon the record. At that point, the Court requested that the parties enter into stipulations if possible, setting forth steps that could be taken to attenuate *473 noise from the testing or repairing of aircraft engines and possible uses of noise suppression equipment on the runways while aircraft awaited clearance for take-off. Gratefully the Court acknowledges the cooperation of counsel in considerably shortening the trial by reaching an agreed state of facts in this regard.
(Here ends the abstracted factual findings.)
In their summation defendants noted the absence of any proof as to physical injury to person or damage to property; no evidence of diminishing value or of difficulty in securing financing of homes; nor any present intentions to sell and leave the area. There is, say defendants, no immediate irreparable harm to either municipal or individual plaintiffs now existing. The fears for what the future may bring blind plaintiffs to a hard cold fact: the air traffic will increase to its estimated saturation point with or without the proposed improvements. Without the improvements, the resulting increased noise will be impossible of attenuation and many safety factors will be unavailable. The court is urged by defendants not to sublimate the federal policy in favor of those individuals who have chosen of their own volition to live near the airport or of those municipalities who refuse to extend a reasonable degree of accommodation to the Airport in the public interest.
It is Hanover's position that the proposed improvements will violate its zoning ordinance and that the attempted encroachment upon such zoning is unreasonable and represents a total aggrandizement of the territory of the Township of Hanover. All plaintiffs, including Hanover, proceed on the theory of nuisance which they claim will arise from a greater intrusion of noise as a result of increased use. Plaintiffs admit that some proposals are founded in good part on safety motives: the I.L.S. system (much more precise than A.D.F.) will decrease possibility of disaster in times of low visibility; parallel taxiways are sorely needed which will enable aircraft to take-off more quickly (without delay while engines race) or permit landing aircraft *474 to be more promptly removed from the runways and diminish "stacked" conditions of circling aircraft waiting to land while a plane having just landed makes use of the runway, there now being no immediately available taxiway to clear the landing strip. But, say plaintiffs, there is a limitation beyond which this municipal airport should not grow and that limitation has been reached.
The full force of plaintiffs' attack is directed to proposed lengthening by 2,000 feet of runway 5-23 at its northerly end and increasing the weight bearing capacity of the runways from 56,000 to 80,000 pounds.
Plaintiffs assert the proposed improvements will result in irreparable, harmful and adverse effects upon life in the surrounding communities and upon the restful peace to which the resident citizens are entitled as a matter of law. Fearing substantial increase in the use of the Airport by an unusual and excessive number of larger jet aircraft, plaintiffs ask for relief which would either prohibit the lengthening of the runway and the strengthening of its weight capacity or, in the alternative, for a determination and declaration of the limits, boundaries, extent and maximum intensity of the use of the Airport.
Defendants first position, not pressed on argument, but fully briefed by defendants and NAS, is that the Congress of the United States has fully pre-empted the field and by such pre-emption has foreclosed states and state courts from interfering in any way with federally regulated air travel and airports. Further, they say the zoning of Hanover Township was arbitrary and unreasonable in terminating the airport zone 100 feet from the north end of runway 5-23; the zoning and planning of the other plaintiff municipalities completely ignored the existence and future growth of the Airport. It is argued that no harm will come to any of the surrounding communities; the noise levels will not reach that point where it will increase the health hazard and discomfort of people residing in the vicinity of the Airport. It is said that this is natural *475 growth, and if the operation is a nuisance, it is a legally authorized nuisance which must be accepted.
Defendants argue that the Interstate Commerce Clause of the United States Constitution precludes this Court from granting any relief. Congress, it is said, with its authority over interstate commerce in all fields, has encompassed air commerce to the fullest extent, both in the air spaces and on the earth itself where the ground in any way becomes an adjunct.
There is no necessity to memorialize in this opinion the history of all Congressional activity in the field of aviation. It would only prolong this opinion to an unprecedented length. The basic federal aviation statute was passed in 1926. With the adoption of the "Air Commerce Act" of 1926, 49 U.S.C.A. Section 171 (repealed in 1958), the "Civil Aeronautics Act" of 1938, 49 U.S.C.A. § 401, and the "Federal Airport Act" of 1946, 49 U.S.C.A. § 1101 (amended as recently as 1961), 49 U.S.C.A. § 1108 et seq., there has been judicial acknowledgment that the field of air traffic regulation, in which the determination of minimum altitudes of flight and of airport control belongs, is recognized as one in which maximum safety can be achieved only by uniformity of regulation throughout the nation. Northwest Airlines v. Minnesota, 322 U.S. 292, 303, 64 S.Ct. 950, 88 L.Ed. 1283, 1290 (1944); Allegheny Airlines v. Village of Cedarhurst, 132 F. Supp. 871 (E.D.N.Y. 1955), aff'd 238 F.2d 812 (2 Cir.1956). These Acts of Congress preempting national navigable air space were not based upon ownership by the United States of all navigable air space and the earth below, but upon the interstate commerce power of Congress. U.S. Const., Art. I, Sec. 8.
In reporting the bill which became the Air Commerce Act, it was said:
The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes *476 navigable or non-navigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil. H.R. Rep. No. 572, 69th Cong., 1st Sess., at 10.
Since Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), the commerce power has embraced navigation of streams. However, the federal commerce power over navigable streams does not prevent state action consistent with that power. Gilman v. City of Philadelphia, 70 U.S. (3 Wall) 713, 18 L.Ed. 96 (1866). The sovereignty of the state is not completely impaired. State of Oklahoma ex rel. Phillips v. Guy Atkinson Co., 313 U.S. 508, 534, 61 S.Ct. 1050, 85 L.Ed. 1487, 1505 (1941). In Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960), the Supreme Court sustained the application of a municipal smoke control ordinance to a vessel operating in interstate commerce powered by federally inspected and licensed boilers. The court stated that local power to regulate such matters is pre-empted only when an "act of Congress, fairly interpreted, is in actual conflict with the law of the state" (at 443, 80 S.Ct., at p. 816). Noting that the purpose of the Federal licensing system was to insure safety, while that of the ordinance was to protect the health and welfare of the community against excessive smoke, the court found no actual conflict.
The similarity of navigable waters and navigable air space in relation to the Interstate Commerce Clause has been recognized. Northwest Airlines Inc. v. Minnesota, 322 U.S. 292, 302, 64 S.Ct. 950, 88 L.Ed. 1283, 1289 (1944) (Jackson, J. concurring). Congress has no greater power and control over the air space and the earth below than it has over navigable waters.
The controls and the remedies provided by the various federal aviation enactments nowhere state that they are *477 sovereign and exclusive. If such a statement were made, the question must then arise whether they would not be in direct conflict with the due process clause. In United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), a chicken farmer alleged that he had been bothered repeatedly by aircraft from a nearby military base. The noise and vibration of overflying aircraft essentially destroyed the residential value of his land and its value as a commercial chicken farm. The court, recognizing an "exclusive national sovereignty" and the right of freedom in air transit, nevertheless held that the owner of land might recover for a taking by governmental use of air space resulting in destruction in whole or part of the usefulness of the property itself.
Since Causby, supra, aviation has grown phenomenally. No longer is the problem confined to over-flying military aircraft. The scheduled carriers were the next offenders. Public service entities, such as transportation authorities, have long been shielded from action on the theories of either legalized nuisance or legislatively authorized noise. But the immunity of national sovereignty to state action is not complete. Where state taxes were levied on scheduled public air carriers, this so-called "exclusive sovereignty" did not preclude such imposition. Braniff Airways, Inc. v. Nebraska State Board, 347 U.S. 590, 74 S.Ct. 757, 98 L.Ed. 967 (1954).
Relying on Allegheny Airlines v. Village of Cedarhurst, supra, City of Newark v. Eastern Airlines, Inc. 159 F. Supp. 750 (D.C.N.J. 1958), American Airlines Inc. v. Town of Hempstead, 272 F. Supp. 226 (E.D.N.Y. 1967), aff'd. 398 F.2d 369 (2 Cir.1968), cert. denied 393 U.S. 1017, 89 S.Ct. 620, 21 L.Ed. 561 (1969), defendants assert complete pre-emption and supremacy to the exclusion of any power of a state. In Allegheny Airlines, an ordinance which prohibited air flights over the village of Cedarhurst at less than 1,000 feet was declared invalid; in Eastern Airlines and American Airlines, the municipalities were *478 held to have no right to enjoin specific flight patterns established by F.A.A. notwithstanding anti-noise ordinances or intolerable noise inflicted upon residents.
These cases are distinguishable in the context of the case now under consideration. In the first place, in each cited case the municipality intruded upon an area in which F.A.A. is expert, namely altitudes, flight patterns, take-offs and landings. With safety to the aircraft, passengers and the land-bound public below as a prime goal, this court agrees that a court's conventional experience and decision-making power cannot and must not supplant the exercise of administrative discretion of the expert agency created by Congress. Where there is a clash between state and federal authority in this regard, the supremacy of the federal is recognized. Where there is no conflict, and certainly where there is state action consistent with the avowed second purpose of F.A.A., suppression of noise, a state court may act.
The Court of Appeals for the 2nd Circuit, in American Airlines, supra, noted in footnote 4 of its opinion:
In view of the conflict between the ordinance and the federal regulation we need not consider the questions of federal pre-emption and undue burden on interstate commerce. (398 F.2d at 376).
The burden on interstate commerce is patently excessive only if the pattern of local regulation presents so acute a conflict that aircraft cannot possibly comply with all standards and continue interstate flight. Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 79 S.Ct. 962, 3 L.Ed.2d 1003 (1959).
The Federal Air Traffic Rules are designed to promote safety and this purpose does not conflict with such local requirements as may be designed to maintain community tranquility and welfare or protect the property interest of the land owners. But the absence of a conflict of purpose between the Federal and local regulations still would not be dispositive if compliance with local standards would *479 in fact seriously undermine the Federal safety scheme. See: 74 Harv. L. Rev. 81, 132 (1960).
Although the ships in Huron, supra, could have met the municipal standard only by effecting structural alterations, the court evidently found this burden insufficient to create a conflict. A means of compliance not violative of the Federal Safety Standards was available. If it is possible for aircraft to be made sufficiently quiet to meet local noise standards without jeopardizing the network of Federal Air Safety Regulations, a municipal noise level ordinance would probably create no conflict within the meaning of Huron. Since Huron also rejected an argument that pre-emption flowed from the fact that the ship was federally licensed, the fact that the planes are licensed and operating within a zone defined by Congress as "navigable airspace" should not immunize them from regulations evincing a valid local interest in maintaining community peace or protecting property rights. Cf. Huron, supra, 362 U.S., at 446-448, 80 S.Ct. 813. If the ability or the cost of compliance with a court decree is so very substantial in comparison with the local interest in reducing the noise interference that the regulation might be held to impose an unreasonable burden upon interstate commerce, the state action must fail.
Further distinguishing the cases relied upon by defendants, the Federal courts were dealing with Allegheny Airlines, Eastern Airlines and American Airlines, all public carriers. The case at bar does not concern itself with scheduled airlines where there has been a certification of need for public transport facilities to assist the general public in its travel through the air space on business or vacation. This distinction must be kept in focus. At Morristown Airport the offensive engine noices for the most part are not emitted by airplanes serving the general public, but by the jets of the few corporate executives who own or charter the aircraft which noisily ride the invisible highway as an industrial status symbol. (See: Harley, Jr., TC, CCH *480 Dec. 29, 803 [M], ¶ 7703 [M] [1969]). If not simply a symbol it is argued that time and energy of the corporate officer and employee is saved. The importance of the speed of travel to the corporate executive must be placed on one side of the scale and balanced against the domestic tranquility to which family and the neighborhood are entitled.
In holding that Morristown Municipal Airport was not subject to the zoning ordinance of Hanover Township, our Supreme Court in Aviation Services v. Board of Adjustment of Hanover Township, 20 N.J. 275 (1955), said:
Our holding in this case is not to be considered as giving judicial recognition or impetus to a program of wholesale aggrandizement of territory. The authority bestowed upon municipalities to establish and maintain public airport facilities must be reasonably exercised in response to the public need, both present and that fairly to be anticipated. (at 285, emphasis added).
From this it must be concluded that there remains some areas in aviation cases where the courts of New Jersey have the power to act. The vindication of legal or equitable rights of the municipalities and their residents may be secured wholly or partially without crossing into the forbidden area of the federal preserve.
Examining next Hanover's complaint that the proposed expansion of runway 5-23 will violate that municipality's zoning ordinance, the ruling in Aviation Services, supra, is binding upon this court and precludes Hanover from barring completely the normal growth of the Airport. The zoning ordinance which cuts airport property from any airport use more than 100 feet from the northerly end of the runway was an attempt to foreclose in a swamp area of limited use any further development. The land upon which the extension of the runway is planned has been owned by the Airport and the proofs do not show this to be a "wholesale aggrandizement of territory." Additionally, it comes with bad grace for the municipality on the one hand to lure industry by promoting the existence and *481 proximity of the Airport and on the other to prevent the natural growth and safety plans which must be undertaken to serve the attracted industry.
The restriction in the zoning ordinance fails to exhibit that which would be a reasonable accommodation for existing legal uses in line with N.J.S. 40:8-1 et seq. and the statement in our State Constitution recognizing the importance of protecting and preserving the public interest in air travel. N.J. Const., Art. IV, sec. 6, par. 3 reads:
Any agency or political subdivision of the State or any agency of a political subdivison thereof, which may be empowered to take or otherwise acquire private property for any public highway, parkway, airport, place, improvement, or use, may be authorized by law to take or otherwise acquire a fee simple absolute or any lesser interest, and may be authorized by law to take or otherwise acquire a fee simple absolute in, easements upon, or the benefit of restrictions upon, abutting property to preserve and protect the public highway, parkway, airport, place, improvement, or use; but such taking shall be with just compensation.
The integrity of Hanover's comprehensive zoning plan where it is within bounds of legitimate purpose will not be irreparably impaired. The attempted curtailment by zoning is without the necessary foundation in law and cannot be used as a basis for injunctive relief against the defendants.
Turning next to the complaints of the residents, defendants say that resident-plaintiffs are not entitled to injunctive relief because there is available an adequate remedy at law. Attention is directed to the remedy of damages for nuisance at common law, the right to seek relief in the nature of inverse condemnation and the statute which creates a cause of action of absolute liability. N.J.S.A. 6:2-7 reads in relevant part as follows:
The owner of every aircraft which is operated over the land or waters of this State is absolutely liable for injuries to persons or property on the land or water beneath, caused by ascent, descent, or flight of the aircraft, or the dropping or falling of any object therefrom, *482 whether such owner was negligent or not, unless the injury is caused in whole or in part by the negligence of the person injured, or of the owner or bailee of the property injured.
Dealing first with the Statute, which sets forth the cause of action and creates absolute liability, it was established at the trial that no single aircraft created the damages complained of by resident-plaintiffs. The accoustical experts only discussed unwanted sound from the standpoint of an unbearable increase in numbers of one type of sound which might be tolerable in small quantities. If the Airport were used by scheduled airlines (commercial carriers) so that blame could be levied against one airline for its continued violations of the statute, then there might be an adequate remedy at law. However, here it is found that the complained of noise sources are not readily identifiable. As a matter of practicality, the legal remedy is foreclosed.
The same is true where the claim for damages is under common law theories of trespass or nuisance. Using theories of trespass, the farmer in Causby, supra, where the military aircraft regularly passed over at altitudes of 83 feet, was permitted to recover monetary damages for overflights found to be physical invasions of the land below. But as was said in Causby,
The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. (328 U.S. at 266, 66 S.Ct. at 1068, 90 L.Ed. 1206).
See also: Griggs v. County of Allegheny, 369 U.S. 84, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962), pet. rehearing denied 369 U.S. 857, 82 S.Ct. 931, 8 L.Ed.2d 16 (1962).
The rationale in both Causby and Griggs was that a taking occurred because the landowners had lost the use of the airspace immediately above the property to the extent it had been occupied by the government. Even if a liberal *483 interpretation of a trespass theory is adopted, the weaknesses are clear. Liability in trespass arises only when the aircraft enters the zone of air space "owned" by the plaintiff. Swetland v. Curtiss Airports Corp. 55 F.2d 201, 203 (6 Cir.1932); Hyde v. Somerset Airservice Inc., 1 N.J. Super. 346 (Ch. Div. 1948). The plaintiff would have the almost impossible task to prove the exact height and the exact passage over his land at which the particular flight or flights occurred. See City of Newark v. Eastern Airlines Inc., 159 F. Supp. 750, 760 (D.C.N.J. 1958). In the case at bar the proofs clearly show that not only the immediate land below the path of flight is affected, but also that the neighbor to either side will frequently be harassed by the same noise.
Most courts have declined to pass upon a trespass allegation and have decided the liability issue solely in terms of nuisance. Hyde, supra. The acceptance of nuisance as the sole theory of relief is more satisfactory for determining liability. Degree of actual interference, rather than a formalistic factor of the relationship of the flight path to a particular zone or column of air space, should be the criterion for relief. The court would then determine whether there was an "unreasonable" degree of interference. Inherent in this determination would be consideration of all relevant interests, including broad national and commercial interests in the particular aviation activities involved.
In Thornburg v. Port of Portland, 233 Or. 178, 376 P.2d 100 (Or. Sup. Ct. 1962), the Supreme Court of Oregon adopted a nuisance standard in a suit against an airport authority. The court there indicated that the effects of repeated noise could become so aggravating as to constitute a taking of property under the state constitution and that the search was for an appropriate balance between the social utility served by an airport and the gravity of the harm imposed on the neighboring property owners. In a second appeal of the same case the court expressed dissatisfaction with the nuisance test. It equated a taking *484 to a loss of market value. Thornburg v. Port of Portland, 244 Or. 69, 74, 415 P.2d 750, 752 (Or. Sup. Ct. 1966). This latter decision follows an earlier holding in the State of Washington where a decline in market value was stipulated as the measure of a constitutional "taking or damaging." Martin v. Port of Seattle, 64 Wash.2d 309, 391 P.2d 540 (Wash. Sup. Ct. 1964), cert. den. 379 U.S. 989, 85 S.Ct. 701, 13 L.Ed.2d 610 (1965).
What are the solutions available to this court? It is possible that the court might determine that a nuisance exists, but that because of the public interest in continuing flights, compensatory damages should be awarded in lieu of an injunction. See City of Harrisonville v. W.S. Dickey Clay Mfg. Co., 289 U.S. 334, 53 S.Ct. 602, 77 L.Ed. 1208 (1933). Monetary compensation has been awarded in eminent domain proceedings against the government for noise arising from military aircraft operations (Matson v. United States, 145 Ct. Cl. 225, 171 F. Supp. 283 (Ct. Cl. 1959)), and in one instance in a similar proceeding against a municipally owned airport for noise from private operations. Ackerman v. Port of Seattle, 55 Wash.2d 400, 348 P.2d 664, 77 A.L.R.2d 1161 (Wash. Sup. Ct. 1960).
Here, there was no evidence at the trial of actual depreciation in market value of real estate. Nor could the finger of guilt be pointed directly at any particular offender. But even had there been such evidence, it is doubtful that the responsibility for damages could be accurately assessed. It matters not whether the noise emanates from a railroad, an express highway, or an airway. To the extent that noise is a necessary incident of lawful activity, free from negligence, the proximate causal relation between liability and damage, and the amount thereof, would be at best speculative.
It should be clear that the effectiveness of a damage remedy is doubtful. The principal objective of the landowner is an abatement of noise, and monetary compensation will not deter airport operations. Noise interference becomes *485 the intrusive substantial annoyance because it emanates from frequent but generally unrelated overflights. The interests of all contributing aircraft must be assessed together, not in the context of 200,000 movements in 1969, but in anticipation of the gradual increase through the ensuing years to the saturation point in 1980 of 380,000 annual movements. This court finds that a wrong exists presently and will reoccur with increasing frequency on a daily basis.
It is hornbook law that a court of equity possesses jurisdiction to enjoin repetitive and expanding nuisances. The remedy in equity for nuisance is broad and flexible. It has been said: "Any business, however lawful, which causes annoyances that materially interfere with the ordinary comfort, physically, of human existence, is a nuisance that should be restrained; * * *." Cleveland v. Citizens Gas Light Co., 20 N.J. Eq. 201, 205 (Ch. 1869). Although there are many ways in which the use of one's property can become offensive as to warrant judicial relief, in the case at bar the offensive use is noise.
In Sans v. Ramsey Golf & Country Club, Inc., 29 N.J. 438 (1959), the court there dealt with the conflicting interests of neighboring property owners and the question of the reasonableness of the defendants mode of use of its land. The court said:
The essence of a private nuisance is an unreasonable interference with the use and enjoyment of land. The elements are myriad. The law has never undertaken to define all of the possible sources of annoyance and discomfort which would justify such a finding. Pollock, Torts (1887), 260, 261. Litigation of this type usually deals with the conflicting interests of property owners and the question of the reasonableness of the defendant's mode of use of his land. The process of adjudication requires recognition of the reciprocal right of each owner to reasonable use, and a balancing of the conflicting interests. The utility of the defendant's conduct must be weighed against the quantum of harm to the plaintiff. The question is not simply whether a person is annoyed or disturbed, but whether the annoyance or disturbance arises from an unreasonable use of the neighbor's land or operation of his business. Prosser, Torts (2d ed 1955), 410. As the Court of Appeals of Ohio put it in Antonik v. Chamberlain, 81 Ohio App. 465, 78 N.E.2d 752, 759 (1947):
*486 "The law of nuisance plys between two antithetical extremes: The principle that every person is entitled to use his property for any purpose that he sees fit, and the opposing principle that everyone is bound to use his property in such a manner as not to injure the property or rights of his neighbor."
Defendant's members have the right to the ordinary and expected use of the golf course. Plaintiffs have the correlative right to the enjoyment of their property. The element of reciprocity must be emphasized because the parties' interests stem from a common source and are more mutually interdependent than in the usual case. The Appellate Division properly suggests the pertinent inquiry to be `whether defendant's activities materially and unreasonably interfere with plaintiffs' comforts or existence, "not according to exceptionally refined, uncommon, or luxurious habits of living, but according to the simple tastes and unaffected notions generally prevailing among plain people." 50 N.J. Super. 127, at page 134, citing Stevens v. Rockport Granite Co., 216 Mass. 486, 104 N.E. 371 (Sup. Jud. Ct. 1914). (at 448).
Although it is concluded that some of the activities of the defendants are manifestly incompatible with the ordinary and expected comfortable environment of the plaintiffs and the normal use of their property, it does not follow that defendants' activities in every respect are unreasonable. The public's interest in flight and the public's interest in a quiet environment requires an evaluation of the conflicting equities. This court must search for a reasonable accommodation of these equities.
It is acknowledged that no remedy is available if it would constitute an unreasonable interference with legislative authority. Here, however, while there is a head-on confrontation of two public interests, a responsibility is imposed upon the court to protect the legitimate interests of both. In cases of this kind there frequently are no winners and no losers.
Substantial justice can often be accomplished by the granting of conditional, experimental or substitutional relief or any equitable combination thereof. "Developments in the Law  Injunctions," 78 Harv. L. Rev. 996 (1965); Sedler, "Conditional, Experimental and Substitution Relief", 16 Rutgers L. Rev. 639 (1962).
*487 Conditional relief was the equitable remedy granted in Medical Fabrics Company v. D.C. McLintock Co., 12 N.J. Super. 177, 182 (App. Div. 1951); experimental relief in Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955); substitutional relief in City of Harrisonville, supra. Whether or not the remedy is appropriate is frequently determined by a comparative appraisal. 4 Restatement Torts, sec. 933 (1939).
Where as here, public welfare and public interest attach to the respective adversary positions, it is peculiarly appropriate to and some means of accommodating both. It is concluded that benefits can be secured to each without destroying the legitimate interests of the other. The decision to grant or to deny injunctive relief is only one aspect of equitable discretion. Within very broad limits, the court is free to adjust the interests of the plaintiffs, the defendants and the public by devising an individually tailored remedy to fit the particular case.
Preventative relief may be effected by ordering a total cessation of flight. Barrier v. Troutman, 231 N.C. 47, 55 S.E.2d 923 (Sup. Ct. N.C. 1949). But so drastic a measure would be completely contrary to expressed national and state interest in air transit. To attempt to decree landing and take-off procedure in any manner contrary to F.A.A. regulations would be to substitute the limited experience of a court for the expertise of F.A.A., whose first order of business is air safety.
No part of any court decree should jeopardize flight safety. This would also apply to noise abatement procedures in flight in the vicinity of the airport. Morristown Airport management has adopted such procedures for landing and take-off, including preferential runway use. It is in the failure of Airport management to enforce such rules against those who blatantly disregard them that creates much dissatisfaction. Complete and detailed information as to enforcement procedures or lack thereof should be available to one who seeks to assert a claim against aircraft operators, *488 owners or Airport management. Since aircraft noise is the inevitable concomitant of airport operation (and the abatement of noise is the second primary interest of F.A.A.), Airport management should be in a position to give to the disturbed public all details of each movement of aircraft.
Most intrusive is the noise from corporate jets. If these are truly used for business, why should not the hours of landing and take-off be limited to normal, reasonable business hours? The corporate executive's desire for early departure and late returns may have to be sacrificed in the interest of a good night's rest for the residents. He may have to leave a day earlier or return a day later. His absence for a few hours more or less will not send his corporation into bankruptcy.
In Babcock v. New Jersey Stock Yard Company, 20 N.J. Eq. 296 (Ch. 1869), the court wanted to avoid the undesirable alternative of denying injunctive relief to the plaintiff by forcing complete cessation or removal of defendant's business. This case involved the operation of a slaughter house by the defendant. There the relief was not completely experimental, as there were some definite requirements imposed. The court did impose minimum mandatory conditions and left the remaining performance to the discretion of the defendant. The defendant in that case was ordered not to keep his hogs in a place where the stench would reach the plaintiffs for more than 3 hours daily. Plaintiff was given leave to apply for modification of the order if the time turned out to be too long for comfort. The court appointed commissioners to propose remedial measures since the defendant had introduced expert scientific testimony to show that its operation could be improved.
Here, too, this court desires to avoid the unacceptable alternatives of denying all injunctive relief to the plaintiffs or of forcing the defendants to refrain from doing that which will increase safety, not only for those who are making use of the Airport, but also for those who reside in areas most affected by defendants' operations.
*489 Many complaints were levelled at the testing of aircraft engines during repair and maintenance while aircraft remain on the ground. The hours of such testing should be limited, and when such engine run-up takes place it should be conducted using the noise suppression devices described in the stipulation. Also, noise baffles at runway ends should be installed, notwithstanding that complete noise attenuation is not achieved. These impositions in no way intrude upon safety in flight.
As was said in Texas Eastern Transmission v. Wildlife Preserves, 48 N.J. 261, 273 (1966):
Existence of a more desirable alternative is one of the factors which courts have recognized as entering into the determination of whether a particular proposal would serve the public convenience and necessity.
Municipal airports have the power to purchase easements of flight over nearby property comparable to the land purchased for the runways in order to enable the planes to operate and thereby diminish the complained of nuisance. Ackerman v. Port of Seattle, 55 Wash.2d 400, 412; 348 P.2d 664, 671, 77 A.L.R.2d 1161 (1960). This could include a buffer zone to maximize airport use. But this may be considered too costly.
Alternative corrective measures may be an added but lesser expense to airport operations. To the extent that the airport can adjust its landing fees upward to reflect these additional costs, they should be passed back to the aircraft owners. Landing fees are generally based on the gross weight of the aircraft and the number of landings made. Therefore, the added expense of noise suppression could be allocated among all users of the airport, non-business as well as business, in a fashion more feasible and substantially more equitable than any apportionment resulting from direct suits for damages against the aircraft owner or operator. Private compensatory damage suits do not accomplish the end objective of noise suppression.
*490 A court may reject entirely the specific relief requested by the plaintiffs and substitute relief which in its judgment better reflects the parties' equities. Early courts condemned injunctions that simply stated a desired goal without letting the defendants know how it was to be achieved. Such injunctions forced the defendants to discover what was forbidden and what was allowed. R. 4:52-4 requires that every order granting an injunction "shall be specific in terms" and "shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained * * *." This rule was taken from the Federal Rules of Civil Procedure 65 (d). But the language of the Rule did not preclude the incorporation therein of experimental relief. The United States Supreme Court in Brown v. Board of Education, supra, recognized a court's power to issue experimental decrees when it directed that action be taken "with all deliberate speed." Although the decree in Brown was not framed in terms which required a defendant to do specific acts in a specified time the court reserved the power to modify the decree as it became necessary, leaving in the first instance the method of performance to the discretion of the defendant.
In Five Oaks v. Gathmann, 190 Md. 348, 58 A.2d 656 (Md. Ct. of App. 1948), the court observed that in nuisance cases decrees should be general, except when it is abundantly clear as to what means are appropriate for achieving the desired results. If, for the purposes of this case, the Airport is considered to be an offending party, it should be allowed to experiment with such measures as will produce the overall desired result.
Such experimentation can lead to an effective remedy with minimum hardship to defendants and maximum benefit under the circumstances to plaintiffs. If the initial means chosen by defendants to accomplish the objectives as set forth by the court should fail, where the decree is not specific defendants will not be held in contempt. The standard at that point is simply a good faith attempt at compliance. *491 In the event that such experiment fails, this court having retained jurisdiction can be more specific, based upon what it has learned by the attempted good faith compliance.
In summary, it is concluded that to accommodate the legitimate interests of both parties, a judgment will be entered as follows:
a) Having determined that the extension and resurfacing will be an additional measure of safety and will produce some attenuation of noise in take-offs and landings, the extension of runway 5-23 and the increase in weight bearing capacity of both runways will be permitted;
b) Having determined that the remaining phases of the General Airport and Layout Plans provide additional measures of safety and noise attenuation, the other provisions of the General Airport Plan and Layout including taxi-ways, I.L.S. system, lighting, et seq. will be permitted;
c) The preferential runway program of F.A.A. shall be under the direction and guidance of F.A.A. control tower personnel enforced by Airport management;
d) The noise abatement procedures promulgated by Morristown Airport shall be enforced by Airport management;
e) So that residents in the vicinity of the airport may assert claims based upon detailed information, a log will be maintained in the Airport management or operations office recording each take-off and landing, name of pilot and registered owner of aircraft, runway used, wind direction and force and time of take-off or landing. This log shall be available for public inspection at the management or operations office between the hours of 8 A.M. and 5 P.M. on each day when the Airport is in operation;
f) So that complaining residents may be fully informed as to policing of Airport and F.A.A. rules and regulations, records shall also be maintained at the management or operations office for public inspection of all complaints received, and such records shall note the action taken thereon by Airport management or F.A.A. or both;
*492 g) There shall also be required noise suppression devices and noise attenuation equipment or engine "test cells" to be installed and used for jet engine maintenance and testing, or in the alternative, the construction and use of facilities acoustically designed for noise attenuation (as referred to in the stipulation) to muffle ground run-up noise during repair and maintenance;
h) Engine testing and run-up during maintenance and repair operations shall be conducted no earlier than a specified hour and no later than a specified hour;
i) Portable shields or sound baffling devices as described in the stipulation shall be used at the southerly end or runway 5-23 and at each end of runway 12-30;
j) Jet aircraft will be prohibited from take-off or landing except during specified hours, unless an emergency exists. Any such emergency will be noted in the log referred to above in (e).
The court recognizes that it has no expertise and in reaching its decision has been guided by the testimony adduced at the trial. It is not unusual for a court in such a situation to utilize the resources of the parties by asking them to submit proposed forms of judgments. E.g. Georgia v. Tennessee Copper Co., 206 U.S. 230, 27 S.Ct. 618, 51 L.Ed. 1038 (1907), 237 U.S. 474, 35 S.Ct. 631, 59 L.Ed. 1054 (1915), 237 U.S. 678, 35 S.Ct. 752, 59 L.Ed. 1173 (1915). If the parties cannot agree on a form of judgment which sets forth the relief granted by court herein, the parties are directed to exchange within five days from the date of this opinion proposed forms of judgment and to appear before the court ten days from the date of this opinion when the court will hear argument on the respective forms and will enter judgment accordingly. No costs to either party.