118 N.J. Super. 136 (1972)
286 A.2d 728
TOWNSHIP OF HANOVER, ET ALS., PLAINTIFFS,
v.
TOWN OF MORRISTOWN, ET ALS., DEFENDANTS, AND THE NATIONAL BUSINESS AIRCRAFT ASSOCIATION, INC., ET ALS., PETITIONERS.
Superior Court of New Jersey, Chancery Division.
Decided January 10, 1972.
*137 Mr. Harry L. Sears for all plaintiffs (Messrs. Young and Sears, attorneys for Township of Hanover, Borough of Florham, Park, A. Stewart Dunford, Thomas E. Kenny, Martin B. Monroe, Joseph Elsman, John E. Flaherty, Norman S. Weinberger; Messrs. Mills and Doyle, attorneys for Township of Morris and Borough of Madison).
Mr. Edward F. Broderick, Jr., for defendants Town of Morristown and Morristown Airport Commission.
Mr. Walter F. Waldeau for all petitioners (Messrs. Stryker, Tams & Dill, Attorneys for all applicants of intervention).
STAMLER, J.S.C.
The original complaint in the case at bar was filed on July 24, 1969. The trial began on October 14, 1969 and lasted for 12 full trial days plus one additional day for site inspection. Thirty-eight witnesses, lay and expert, testified. A prodigious number of documents, sketches, surveys, plans, etc., were received in evidence. Arguments were concluded on November 5. The court on December 10, 1969 rendered its opinion, which is reported in 108 N.J. Super. 461 (Ch. Div. 1969). On March 23, 1970 judgment was entered. As noted in the concluding paragraph of the opinion and in the first paragraph of the *138 judgment, the court utilized the resources of not only the attorneys for the respective parties but the parties themselves and a variety of technical consultants to formulate what it considered an experimental judgment. All attorneys approved the form of the judgment.
On May 17, 1971 a petition to intervene was filed. Those who now seek to become defendants by intervention are:
The National Business Aircraft Association, Inc. (hereinafter "NBAA"). It is a New York corporation with its principal place of business in Washington, D.C. Its 840 members are corporations located in 42 states, the District of Columbia and Canada. It is a nonprofit organization formed to promote the aviation interests of its member corporations operating aircraft as an aid to the conduct of their respective businesses. Avowed is their purpose "* * * to advance and maintain and enlighten understanding on the part of governmental and airport authorities of problems; to take such steps as are proper and necessary in order to promote better relations and secure proper advantages from regulatory and other agencies, and by these means to obtain wider recognition of the fact that the aviation activities of its members are of primary importance to the domestic economy of the nation."
The Air Transport Association of America (hereinafter "ATA"), an unincorporated association with its headquarters in Washington, D.C. Its 32 members are the commercial air carriers serving the United States. Its purposes are to encourage cooperation between its members and to represent the common interests of its member airlines to public and governmental agencies. In fulfillment of these purposes the ATA has participated in litigation throughout the nation concerning the scheduled airlines.
Additionally seeking to be admitted as defendants are 12 major air carriers: Allegheny Airlines, Inc., American Airlines Inc., Braniff International, Delta Airlines, Inc., Eastern Airlines, Inc., Mohawk Airlines, Inc., National Airlines, Inc., Northwest Airlines, Piedmont Airlines, Trans-Caribbean Airlines, Inc., Southern Airways, Inc., and United Airlines, Inc. Each of the foregoing is a Delaware corporation except Braniff (Nevada), Mohawk (New York), National (Florida), Northwest (Minnesota) and Piedmont (North Carolina). Each holds a certificate of public convenience from the Civil Aeronautics Board (hereinafter "CAB") to serve Newark Airport, where each maintains a place of business.
Petitioners seek to alter only two paragraphs of the judgment, specifically paragraph "C" which prescribes a preferential *139 runway system for jet aircraft, and paragraph "I" which limits jet aircraft operations at Morristown Municipal Airport (hereinafter "MMU").
Plaintiffs were six individual citizens and four small municipalities. The latter, Hanover, Morris Township, Florham Park and Madison, have a total population of less than 60,000. The citizens of these towns residing or working in close proximity bitterly complained of the nuisance created by the operations at Morristown Municipal Airport.
Defendants Town of Morristown and Morristown Airport Commission state that they have no objection to intervention by the two associations and the 12 airlines. Plaintiffs strenuously resist.
Seven months after entry of judgment, on October 21, 1970, the Federal Aviation Administration (hereinafter "FAA"), through its airport traffic control tower at MMU, issued a "tower bulletin" prescribing the official noise abatement procedures and preferential runway system for jet aircraft using the airport. Petitioners say that because this tower bulletin was promulgated by FAA, an agency created by the Congress of the United States, it must be considered as preempting this field of regulation. Virtually all of the owners of nonmilitary, noncommercial jet aircraft in the United States are members of NBAA. All of the fixed based jet aircraft owners at MMU are members of NBAA. It is urged that paragraph "I" forbids owners of jet aircraft access to national airspace for almost one-half of the time each week; that access to the national airspace is a right granted by federal statute; therefore "I," which limits the hours of operation on the week days and Sundays, is in conflict with supreme federal law. Asserting interference and a direct burden on instrumentalities of interstate commerce, petitioners argue that it is beyond the power of any other agency of government, including this court, to impose regulations. If intervention is granted, petitioners desire to reopen the case for consideration of the judgment and offer to present legal arguments to show that this court was without *140 jurisdiction to grant the relief in the judgment because it infringes on an area preempted by Congress and is an undue burden on interstate commerce. Petitioners also state that, if permitted to intervene, they will present testimony in open court on the "national and regional implications of the judgment" to support reasons for vacating paragraph "I" on general equitable grounds. The ultimate goal is to lift the restraints on operations contained in paragraphs "C" and "I" of the judgment.
Petitioners assert that they can bring to this court's attention information not previously considered and pertinent facts developed subsequent to the experimental judgment. They state that they are not asking for a reconsideration of any matters fully presented and considered for determination except as may be changed by later developments. Attorneys for petitioners say that they were required to await the preparation of the transcript to review it in order to present arguments on intervention. This, they aver, is the reason for delay, for the transcript was not substantially completed until May 10, 1971.
R. 4:33-1 provides for intervention as of right if those who seek to intervene (a) make timely application, (b) claim an interest relating to the subject matter of the action, (c) are so situated that the disposition of the action may as a practical matter impair or impede their ability to protect that interest, and (d) that interest is not adequately represented by the existing parties. The four standards are conjunctive.
R. 4:33-1 is taken substantially from F.R. Civ. P. 24, 28 U.S.C.A. Rule 24. There are few decisions in our State concerning R. 4:33-1 and therefore we must look to those cases decided by the federal courts. Testut v. Testut, 32 N.J. Super. 95, 99 (App. Div. 1954). Petitioners rely upon Cascade Natural Gas Corporation v. El Paso Natural Gas Co., 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967). There a state, a customer and a competitor, sought to intervene in a government anti-trust suit after the suit had been tried, appealed to the United States Supreme Court and remanded *141 for divestiture proceedings. The state's interest was to insure competitiveness within the market in that state; the customer's interest was to be protected from paying indirectly the costs of an unfair divestiture, and the competitor's interest was to insure adequate supply from El Paso. The District Court denied intervention. The Supreme Court reversed, holding that the applicants for intervention should have been permitted to intervene as of right. That case is readily distinguishable from the case at bar. There the total effect of the ordered divestiture proceeding was to become a new trial and certainly the state, the customer and the competitor would have had a right to intervene had the divestiture trial been a separate trial and had the application been made forthwith. There is no question that a liberal interpretation has been given by the United States Supreme Court to F.R. Civ. P. 24. There are, however, limitations, and the broad sweep of Cascade has been narrowed. See United States v. Automobile Manufacturers Ass'n, Inc., 307 F. Supp. 617 (C.D. Cal. 1970), affirmed p.c., 397 U.S. 248, 90 S.Ct. 1105, 25 L.Ed.2d 280 (1970).
After noting that intervention after judgment is not often granted, the court said in Clarke v. Brown, 101 N.J. Super. 404 (Law Div. 1968):
The question of timeliness cannot be considered in vacuo. Whether an application to intervene is timely does not depend solely upon the amount of time that may have elapsed since the institution of action by the moving party, although of course that is a relevant consideration. See 4 Moore's Federal Practice, p. 98. Other factors which must be considered in connection with timeliness are whether the granting of the motion would entail appreciable prejudice to the other parties or the court, and at what stage in the total proceedings the motion to intervene is made. [at 410]
The court in Clarke cited Tesseyman v. Fisher, 231 F.2d 583 (9 Cir.1955), and held that intervention is within the discretion of the trial court and untimeliness was sufficient ground for denying the motion to intervene.
*142 In United States v. Blue Chip Stamp Company, 272 F. Supp. 432 (D.C. Cal. 1967), aff'd, Thrifty Shoppers Script Co. v. United States, 389 U.S. 580, 88 S.Ct. 693, 19 L.Ed.2d 791, the trial court said:
The rule for intervening after entry of a final judgment is set forth in Barron & Holtzoff, Fed. Prac. & Proc. 2 ¶ 594:
`Intervention may be allowed after a final judgment or decree if it is necessary to preserve some right which cannot otherwise be protected, but such intervention will not be permitted unless a strong showing is made.'
Petitioners have failed to make any showing at all as to any right which may only be protected by intervention. Furthermore, there is no showing that their applications are `timely.'
Rule 24 fails to provide any standard by which timeliness may be tested. Thus, it is necessary to look to all the circumstances in a given case. However, the courts do not look with favor upon one who, fully aware of what has transpired, nonetheless fails to act on his rights and is unreasonably tardy in filing a petition for intervention. Thus, it has been stated:
`[W]e might say we do not see any reason why these interveners could not have sought intervention much earlier. The Court should also consider the state of the cause. That is, as we have pointed out, the case has been concluded; a decree entered; and the parties have reached an amicable settlement and dismissed their appeal. The applicants for intervention here have in effect slept on their rights, and now they want this Court in effect to administer the motion picture industry in the distribution of motion pictures in Western Pennsylvania. We do not feel that this is a function of a district court.' Basle Theatres, Inc. v. Warner Bros. Pictures Distributing Corp., 24 F.R.D. 476, 477 (W.D. Pa. 1959). [272 F. Supp. at 435]
The foregoing guidelines are useful in helping this court in the exercise of its discretion.
Petitioners stress the acts of Congress over aviation and argue preemption and supremacy. Both arguments were presented to the trial court which considered and resolved these in its opinion (108 N.J. Super. 461 (Ch. Div. 1969).
Attention is next addressed to questions of timeliness of the petition and immediate interest of petitioners.
The complaint was filed in July 1969. The case immediately obtained wide publicity, which continued during *143 the entire litigation. News reports and editorials were not limited to New Jersey newspapers. One New York paper with extremely broad circulation presented cartoons and caricatures in addition to its news stories. It cannot be seriously urged that each and all of the petitioners were unaware that the trial was going on.
It is admitted by petitioners that one NBAA member company had its aircraft based at MMU since 1951. At the time of trial there were five NBAA members based at Morristown, and one company which controls another NBAA member had recently moved its fan jet Falcon to the MMU. These companies are presently operating eight jet aircraft. At least three, if not more, of these companies have what are called "NBAA representatives." Bedore, in his affidavit, acknowledges that the jets using MMU, whether as a fixed base or as transient, are owned by members of the NBAA. It appears incredible that these NBAA representatives only learned of the pending litigation after the judgment was entered.
An essential prerequisite to intervention is timeliness, which should be equated with diligence and promptness. One who is interested in pending litigation should not be permitted to stand on the sidelines, watch the proceedings and express his disagreement only when the results of the battle are in and he is dissatisfied.
Petitioner's attack on the judgment is limited only to paragraphs "C" and "I." Paragraph "C" reads as follows:
C. Having determined from the evidence that the wind rose patterns at the Morristown Airport indicate that the prevailing winds favor the utilization of Runway 5-23 approximately ninety percent of the time, it is directed that after the completion of the extension of said runway, that the preferential runway at Morristown shall be 5-23. This runway shall be utilized as the preferential one by all jet aircraft landing and taking off at Morristown, except as follows:
(1) When the cross wind component on 5-23 is found to be in excess of twenty (20) knots;
(2) When an emergency landing or take-off situation exists;
*144 (3) When the use of Runway 12-30 shall be requested and/or directed by the Airport Tower personnel in the interests of flight safety. Furthermore, such preferential runway program when initiated, shall be under the direction and guidance of F.A.A. control tower personnel and enforced by the management of Morristown Airport.
This paragraph was acceptable to the parties to the initial litigation. FAA issued its "Tower Bulletin" five months after the judgment complained of and described 5-23 as the "Preferential Runway." In other words, petitioners should not be heard to complain of the court having directed in March 1970 that runway 5-23 shall be the "preferential runway" and having further stated that FAA control tower personnel in the interest of flight safety shall direct the use of the alternate runway 12-30. The opinion of the court (108 N.J. Super. at 491), anticipated by some eight or nine months what FAA discovered and promulgated in November of 1970. The affidavits supporting the petition indicate that subsequent to the judgment of the court, NBAA and ATA made studies and met with representatives of FAA and MMU management and that thereafter the tower bulletin referred to was promulgated. This tower bulletin is nothing more than an extension of what the court said in its judgment. In petitioners' brief the following statement is made:
Although, in the case at bar, the applicants for intervention have been made aware of the litigation for about a year, they have been doing something about it during that period. The NBAA made a technical study of the operations at MMU (Bedore Affidavit, ¶ 16). Thereafter the NBAA and the ATA met several times with representatives of the FAA and the Airport Management, and as a result of those meetings the FAA on October 21, 1970 promulgated Morristown Airport Traffic Control Tower Bulletin No. 70-1 effective November 9, 1970 which established a preferential runway system for MMU (Bedore Affidavit, ¶ 18). [Emphasis supplied]
The real concern of the petitioners is directed to paragraph "I" of the judgment, which reads as follows:
I. Oral argument having been heard from counsel and a proffer of proof having been made by counsel for defendants on the subject of *145 restricting jet aircraft at Morristown Airport during certain hours and good cause being shown therefore, the Court directs that jet aircraft will be prohibited from takeoffs or landings each day between the hours of 9:00 P.M. until 7:00 A.M. and on Sundays, except during the hours of 1:00 P.M. until 3:00 P.M., unless an emergency exists, or the interests of flight safety require the utilization of the airport under the guidance and direction of the F.A.A. tower personnel.
Petitioners' arguments on this score are:
The limitation on operations ordered by paragraph "I" directly restricts the aviation operations of hundreds of NBAA member corporations. Since jet business aircraft are mainly operated and owned by nationwide corporations (Exh. 1, Bedore affidavit), a limitation on operations at one terminal directly and indirectly affects aircraft operations all across the country. An aircraft may not leave California if it cannot get to MMU before it is closed to jet aircraft. The restriction hits especially hard on the NBAA members that are based at MMU. A study of the logs of three jet aircraft based at MMU showed that in the first five months of the restrictive order on 35 different occasions these aircraft had to land at an alternate airport in the metropolitan area, remain overnight and return to MMU in the morning, and on 11 occasions they had to relocate at another airport in order to perform scheduled departures (Bedore affidavit, ¶ 20). (The affidavit fails to state how many jet take-offs and landings occurred in this same period, notwithstanding the limitation.) In addition, the restrictions on operations have curtailed the usefulness and efficiency of business jet use and have limited its key advantage  flexibility. Virtually the entire direct burden of the restriction on operations is borne by NBAA members, as all non-commercial, non-military jets in the United States are business jets (Bedore affidavit, ¶ 3).
Petitioners are "big business," operating in a nation spanned by four time zones infected with widespread local limitations as distinguished from FAA uniform regulations. The affidavit which supports the petition sets the tone of petitioners' concern:
*146 6. Business aircraft are tools of management which provide top executives with frequent face to face personal contacts and an increased organizational span of control. These aircraft provide flexible national transportation to busy executives and frequently make five or more business stops in a single day.
7. Business aircraft allow management to go when and where they need to keep pace with the continuing growth and geographical dispersion of successful business operations. The privacy and on-board facilities provided on most business aircraft allow conduct of business and preparation of documents while flying between intermediate points.
8. A user survey made in 1966 by Arthur D. Little, Inc., engineering consultants of Cambridge, Massachusetts, for Lockheed-Georgia, a manufacturer of business aircraft, showed that company aircraft were used mainly for executive and staff travel, because relatively few skilled managers are available to any one company to make top decisions and, in terms of responsibility and geography, their span of control must cover large areas of the organizational structure.
Petitioners urge that a jet plane which leaves California early in the morning arrives too late to be able to land at MMU. This argument presumes that the citizens who live in communities surrounding Morristown Airport are required to concern themselves with local airport regulations in California, Oregon and Washington. It may be necessary for these busy corporate executives to leave from a "free" or "unrestricted" business airport on the west coast at a very early hour, taking into account the time zones and the differential of three hours to arrive in Morristown within the permitted hours. It would not damage the efficiency of the essential executive to arise three hours earlier and take into account the time differential.
The affidavit of Bedore indicates that there are functional uses to the "privacy and on-board facilities." The quiet of the private jet in flight and the absence of the hustle and bustle common to the scheduled airliners would permit the weary business executive to make up for the lost sleep which occurred from the early departure on his jet aircraft with private on-board facilities. There is no private business executive who is too important to use the scheduled air carriers serving 515 airports in the 48 coterminus states. No *147 consideration is given by petitioners to the man who may be working late in his home in Morris County in preparation for his next day's activities, or asleep, resting for the hard day's work ahead. Disturbed by the whining howl of the landing or taking-off jet, his home no longer is his castle. It has been invaded and overrun by frightening and unwanted noise. He may willingly or grudgingly make such sacrifice in time of war or to satisfy the needs of government or the general travelling public. It is doubtful that he would be content to do it for the private corporation executive, who might find it a little less convenient to use the conventional piston-engine aircraft which use MMU without the restrictions. In noting that the relative equities must be considered, this court in its opinion said:
* * * At Morristown Airport the offensive engine noises for the most part are not emitted by airplanes serving the general public, but by the jets of the few corporate executives who own or charter the aircraft which noisily ride the invisible highway as an industrial status symbol. (See: Harley Jr., TC, CCH, Dec. 29, 803[M], ¶ 7703 [M] [1969]). If not simply a symbol it is argued that time and energy of the corporate officer and employee is saved. The importance of the speed of travel to the corporate executive must be placed on one side of the scale and balanced against the domestic tranquility to which family and the neighborhood are entitled. [108 N.J. Super. at 479]
The trial was costly in time and money, and plaintiffs were less able to afford the burden. More than 30 witnesses testified. In addition to complaining local residents both sides presented testimony of experts. Experts in accoustical engineering, architectural engineers, airport planning experts and attorneys either presently or formerly with FAA testified at the trial. Zoning and planning experts supplemented the testimony of consultants whose expertise was in noise and vibration control. The Director of Aeronautics of the State of New Jersey, who works closely with FAA, testified, as did representatives of FAA. More than 60 exhibits, most of which were of a technical nature prepared by experts, were received in evidence at the trial. Having suffered a *148 very expensive trial, the four small municipalities and six taxpayers are now challenged by eager adversaries whose team would be represented by the following participants: NBAA with its 840 corporate members comprising the largest companies in the world; ATA with its 32 commercial aircarriers of which 13 are co-petitioners here; coming to their aid and assistance at no expense would be the representatives and experts of FAA.
It has been said that governmental agencies are in many instances engulfed and controlled by the very businesses and industries over which their guardianship in the public interest is directed. Witness the efforts of utility companies aided and abetted by the Federal Power Authority. See Scenic Hudson Preservation Conf. v. Federal Power Commission, 354 F.2d 608 (2 Cir.1965), cert. den. sub nom., Consolidated Edison Co. v. Scenic Hudson Preservation Conf., 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966).
Decimus Junius Juvenal, a Roman poet (60-140 A.D.), posed this question many years ago: "But who is to guard the guards themselves?" Today and in the context of this case the same question takes on greater relevancy. Where are the national or state protectors of the environment in the interest of all the citizens? Should not these agencies charged with obligations to provide clean water, clean air and a respectable measure of quiet and solitude be the well-equipped adversaries of their competing federal and state agencies? Substantially less litigation would result if contending executive agencies performed their respective delegated duties before a lawsuit had to be filed calling for judicial intervention. For example, in the case at bar, the National Environmental Protection Agency, representing the general public, and FAA, by conferring and establishing definitive policies might well have solved the problems  or at least made the initial adversary proceeding a more equal contest and thereby assisted the court in arriving at an equitable determination of the complex separate interests. This would apply to the many existing lawsuits, in both *149 federal and state courts, suits which are becoming increasingly and alarmingly abundant, where the Federal Power Authority or highway or transportation agencies find themselves engaged in unevenly matched contest of their experts against citizens who cannot afford and should not be required to expend great sums for trial in the common weal.
Perhaps the time has arrived when the giants of industry will see the wisdom of slowing the cross-country speed of their important executives and will take a close, concerned look at the little people of this country who by their purchases contribute to industry's growth.
The inequality of the adversary proceeding as proposed by petitioners would not assist this court in its search for substantial justice.
This court concludes that it has not been shown sufficiently valid grounds for exercising its discretion and granting intervention. The application to intervene is denied. Plaintiffs' attorney is directed to prepare and submit an order consented to as to form or settled pursuant to Rule of Court.